MICHAEL L. HAMILTON, Transferee, Petitioner v COMMISSIONER OF INTERNAL REVENUE, Respondent
Hamilton v. Commissioner
Docket No. 48208-86
United States Tax Court
T.C. Memo 1991-25; 1991 Tax Ct. Memo LEXIS 19; 61 T.C.M. (CCH) 1708; T.C.M. (RIA) 91025; January 23, 1991, Filed Decision will be entered for the respondent. Everett A. Bell, for the petitioner. Robert W. Kern and Susan Gray, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined, pursuant to section 6901, that petitioner is liable, as a transferee of property, for a deficiency in the 1982 Federal income tax of the transferor Mr. Marvin A. Rivers. (Except as otherwise indicated, all section references are to the Internal Revenue Code, as amended.) The issue for decision is whether, for purposes of section 6901, respondent has met his burden of proving that petitioner is Mr. Rivers' transferee under Ohio law. FINDINGS OF FACT Some of the facts have been stipulated, and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. In 1970, petitioner became acquainted with Mr. Rivers, the transferor, while attending school in Birmingham, Alabama. He became reacquainted with Mr. Rivers in 1974. Petitioner was living in Detroit, Michigan, at the time but occasionally traveled to Cleveland, Ohio, to attend social functions which Mr. Rivers also attended. In 1975, after *20 petitioner moved to Cleveland, he and Mr. Rivers became roommates. By 1978, they were sufficiently close friends that they jointly purchased a house in Shaker Heights, Ohio. To finance the purchase, they borrowed $ 42,900 from the Ohio Savings Bank and gave a 30-year mortgage to the bank, secured by the house as collateral. Petitioner and Mr. Rivers shared more than their living accommodations. They also purchased a 1977 Oldsmobile 98 in 1979, and they purchased a 1977 Cadillac Seville approximately one year later. The Cadillac was purchased for $ 7,795. Both cars were titled in their joint names. Additionally, in 1980 Mr. Rivers opened a joint checking account at the Euclid Som Center Branch of National City Bank. Both petitioner's name and Mr. Rivers' name appeared on the account and both of them had the authority to sign checks. Petitioner signed at least two checks drawn on the account between 1980 and 1982 in the approximate total amount of $ 89.22. During the years 1982, 1983, and 1984, petitioner was employed as a school teacher by the Northeast Ohio Development Center. On his Federal income tax returns, he reported gross income consisting entirely of his teacher's *21 salary, except he also reported a state tax refund of $ 59.05 in 1984. For 1982, 1983, and 1984, petitioner reported gross income of $ 16,295.80, $ 17,534.36, and $ 19,058.41, respectively. If such amounts are reduced by the cash deductions which petitioner reported, he was left with approximately $ 11,000 per year or approximately $ 200 per week. In 1982 and 1983, Mr. Rivers was employed as an accountant for Dalton Industry, Inc. ("Dalton"), in Willoughby, Ohio. He embezzled $ 83,683.40 from Dalton in 1982. He deposited the entire sum into the National City Bank checking account. Mr. Rivers did not declare the embezzled funds for estimated tax purposes or report the money as income on his Federal income tax return for 1982 or any other year. On November 1, 1982, Mr. Rivers gave petitioner a certified check in the amount of $ 28,000. It was drawn on the National City Bank account. Mr. Rivers was insolvent before and after he gave the money to petitioner. Petitioner used the $ 28,000 check to purchase a 1979 Mercedes Benz, Model 450SL, titled solely in his name. Petitioner used the car for his personal benefit and enjoyment. Mr. Rivers left Dalton's employ in May 1983. *22 By August 1983, it was evident that he was under investigation by the City of Willoughby, Ohio. In October 1983, the Willoughby police department arrested both Mr. Rivers and petitioner. At the time of their arrest, the police searched their house in Shaker Heights and seized personal papers of Mr. Rivers and petitioner. The police also seized a 1983 Buick Skylark which Mr. Rivers had purchased in March of 1983. Petitioner and Mr. Rivers retained the same attorney, Ms. Pat Blackmon, to represent them in connection with the criminal charges arising from Mr. Rivers' embezzlement of funds and petitioner's receipt of stolen money. In April 1984, Mr. Rivers pled guilty to, and was convicted of, three felony counts of receiving stolen property. Petitioner pled no contest to and was found guilty of receiving stolen property. He was sentenced to 60 days in the Lake County Jail. Mr. Rivers was sentenced to a prison term in the Chillicothe Correctional Institution in Chillicothe, Ohio. He was imprisoned from approximately April through October of 1984. From October through February of 1985, he lived, under state jurisdiction, in other facilities which allowed him to be furloughed *23 for work. During the time Mr. Rivers was incarcerated, he received correspondence from the Internal Revenue Service which told him that the Internal Revenue Service considered the funds embezzled from Dalton to be includable in his gross income and subject to income tax. On November 27, 1984, Mr. Rivers transferred his interest in the 1977 Cadillac Seville to petitioner. The transfer was listed as a "gift" on the title records for the automobile. On August 13, 1985, respondent sent petitioner a so called 30-day letter proposing to assess against him "the amount of $ 28,000, plus interest as provided by law, constituting * * * liability as a transferee of the assets of Marvin A. Rivers * * * for income taxes due from taxable years [sic] ended December 31, 1982." Petitioner retained an attorney, Ms. Sandra Walker, to represent him before the Internal Revenue Service, and he filed an administrative appeal with respondent. In that connection, petitioner made an affidavit on September 9, 1985, which states that "he did not have a joint bank account" with Mr. Rivers and "he had no knowledge of the embezzled income," but that "he did receive a personal loan from Marvin A. Rivers in 1982 *24 which enabled him to buy an automobile," and finally that "he has been paying Marvin A. Rivers [sic] past credit card debts instead of repaying the personal loan directly to him." Mr. Rivers gave petitioner and his attorney an affidavit dated June 22, 1986, which states that Mr. Rivers made a personal loan to petitioner to purchase an automobile and further states that the loan was repaid "in part by paying off credit cards * * * in part by paying legal expenses * * * and in part by selling the car to pay other debts." Mr. Rivers' affidavit was attached to the petition but neither party sought its introduction into evidence. On February 14, 1986, Mr. Rivers received a statutory notice of deficiency in which respondent determined deficiencies in and additions to his 1982 and 1983 Federal income taxes. On May 5, 1987, this Court entered its decision against Mr. Rivers in the following amounts: Income Tax
Additions to Tax, Sections
Year
Deficiency
6653(b)(1)
6653(b)(2)
6661
1982
$ 17,782.37
$ 8,891.19
* *25 $ 1,778.24 1983
8,248.00 4,124.00
**
824.80
The above deficiencies and additions to tax remain unpaid. At the time of trial, Mr. Rivers was unemployed and had no property from which the deficiencies and additions could be collected. On September 24, 1986, respondent issued a statutory notice of liability to petitioner in which he determined that petitioner is liable as a transferee with respect to the deficiencies in Mr. Rivers' 1982 and 1983 income taxes. Petitioner filed a timely petition for redetermination in this Court. He resided in Shaker Heights, Ohio, at the time. Respondent conceded in his answer that petitioner is not liable as a transferee with respect to the deficiency in Mr. Rivers' 1983 income taxes. OPINION Section 6901 prescribes a procedural mechanism by which the Commissioner of Internal Revenue can pursue a person who qualifies as a transferee of property to collect tax liabilities of the transferor. See, e.g., Phillips v. Commissioner, 283 U.S. 589, 75 L. Ed. 1289, 51 S. Ct. 608 (1931), affg. 42 F.2d 177 (2d Cir. 1930), affg. 15 B.T.A. 1218 (1929). It provides that the liability, *26 at law or in equity, of a transferee of property "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." Among the liabilities which may be collected in this manner, it specifically includes a transferee's liability for the income taxes due from the transferor. Sec. 6901(a)(1)(A)(i). A petitioner's liability as a transferee is limited to the fair market value of the property received from the transferor. See, e.g., C.D. Construction Corp. v. Commissioner, 451 F.2d 470 (4th Cir. 1971), affg. T.C. Memo 1978-297. In general, the existence and extent of a transferee's liability for the unpaid tax liability of the transferor is determined under state law. Commissioner v. Stern, 357 U.S. 39, 45, 2 L. Ed. 2d 1126, 78 S. Ct. 1047 (1958); John Ownbey Co. v. Commissioner, 645 F.2d 540, 543 (6th Cir. 1981). Respondent bears the burden of proving in proceedings before this Court that a petitioner is liable as a transferee of property, but not of showing that the taxpayer is liable for the tax. Sec. 6902(a); Rule 142(d), Tax Court Rules of Practice and Procedure.
In *27 this case, respondent seeks to assess and collect from petitioner the deficiency in Mr. Rivers' 1982 income tax which was brought about by Mr. Rivers' failure to report as gross income the funds which he embezzled from Dalton during the year. Petitioner and Mr. Rivers resided in the State of Ohio at the time of the transfer and all of the events surrounding it took place there. Accordingly, we apply the law of the State of Ohio to determine petitioner's liability as a transferee for Mr. Rivers' 1982 income taxes. See Delia v. Commissioner, 362 F.2d 400, 402 (6th Cir. 1966), affg. T.C. Memo 1964-329. Under Ohio law, a creditor whose claim has "matured" can have a fraudulent conveyance "set aside or obligation annulled to the extent necessary to satisfy his claim," or he can "disregard the conveyance and attach or levy execution upon the property conveyed." Ohio Rev. Code Ann. sec. 1336.09(A) (Anderson 1961). In order to do so, the creditor may proceed against "any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase." Ohio Rev. Code Ann. sec. 1336.09(A). Ohio law also provides remedies for a creditor whose claim has not *28 matured. Ohio Rev. Code Ann. sec. 1336.10. The Ohio statute defines as "fraudulent as to creditors" certain conveyances that are deemed to be fraudulent without proof of the transferor's intent. See Ohio Rev. Code Ann. secs. 1336.04 and 1336.05. This category includes conveyances made by a person who is or will be thereby rendered "insolvent." Ohio Rev. Code Ann. sec. 1336.04. The Ohio statute also defines as "fraudulent" certain conveyances made with intent to defraud, Ohio Rev. Code Ann. sec. 1336.07, or with intent to incur debts beyond the debtor's ability to pay, Ohio Rev. Code Ann. sec. 1336.06. Finally, a section of the Ohio Code which is not part of Ohio's fraudulent conveyance law, section 1313.56, provides that creditors may sue to declare void any sale, conveyance, transfer, mortgage, or assignment made by a debtor with a design to prefer one or more creditors to the exclusion of others, or made with intent to hinder, delay, or defraud creditors. As prerequisite for such a suit, the creditor must show that the person to whom the sale, conveyance, transfer, mortgage, or assignment was made knew of the debtor's fraudulent intent. Ohio Rev. Code Ann. sec. 1313.57. *29 Respondent argues that the transfer of money by Mr. Rivers to petitioner is a fraudulent conveyance within the meaning of section 1336.04 of the Ohio Rev. Code Ann. That section states as follows: Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.
Under that provision, a transfer is fraudulent if the creditor proves that the debtor was insolvent or was made insolvent by the transfer and there was a lack of fair consideration. See Sease v. John Smith Grain Co., 17 Ohio App. 3d 223, 225, 479 N.E.2d 284, 288 (1984). If these burdens are met, the transfer is fraudulent as a matter of law and neither the intent of the transferor nor knowledge of the transferee need be proven. Sease v. John Smith Grain Co., Inc., supra at 288; Cellar Lumber Co. v. Holley, 9 Ohio App. 2d 288, 224 N.E.2d 360 (1967). Petitioner concedes that in November 1982, he received a transfer of $ 28,000 in cash from Mr. Rivers. A payment of money is included within the definition *30 of "conveyance." Ohio Rev. Code Ann. sec. 1336.01(B). Petitioner has also stipulated that Mr. Rivers was insolvent before and after the transfer by virtue of his liability to repay the funds embezzled from Dalton and further by virtue of his liability for estimated tax payments due on the amount of the embezzled funds. See Ohio Rev. Code Ann. sec. 1336.02 for the definition of "insolvency." Petitioner does not take issue with respondent's contention that respondent qualifies as a "creditor" under the following, broad definition of the term under Ohio law: 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent. [Ohio Rev. Code Ann. sec. 1336.01(C)].
In this connection, we note that Mr. Rivers gave the money to petitioner in November of 1982 before Mr. River's 1982 income tax liability arose. See Hartman v. Lauchli, 238 F.2d 881, 888 (8th Cir. 1956). We also note that this and other courts have held a transferee retroactively liable for the transferor's taxes and additions to tax in the year of the transfer. Scott v. Commissioner, 117 F.2d 36, 38 (8th Cir. 1941); Swinks v. *31 Commissioner, 51 T.C. 13, 17 (1968); Kreps v. Commissioner, 42 T.C. 660, 670 (1964), affd. 351 F.2d 1 (2d Cir. 1965). Petitioner's position is that Mr. Rivers did not give the money to him as a gift or otherwise without consideration. He claims that Mr. Rivers gave the money to him as a loan and thus Mr. Rivers received "fair consideration" for the money. Section 1336.03(B) of the Ohio Rev. Code Ann. defines "fair consideration" as follows: Fair consideration is given for property, or obligation: * * * (B) when such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.
Petitioner argues that, as a result, there was no fraudulent conveyance under section 1336.04 of the Ohio Rev. Code Ann., as asserted by respondent. We start our analysis by reviewing the story which emerges from petitioner's and Mr. Rivers' testimony at trial. We are told that Mr. Rivers, an accountant, decided to make a cash loan of $ 28,000 to enable petitioner to buy his "dream" car, a Mercedes Benz. We are told that petitioner was "hesitant *32 * * * about borrowing that much money." In this connection, we note that petitioner's teacher's salary for 1982 was just $ 16,295.80 and he already owned a one-half interest in two other cars. Nevertheless, the story goes, Mr. Rivers convinced petitioner to take the money by telling him that he could pay $ 400 per month and that he should consider the transaction "like an investment" because the Mercedes "would probably appreciate" after approximately ten years. We are told that Mr. Rivers made the loan to petitioner and required only petitioner's verbal promise to repay it. The only term of the loan was that petitioner would pay approximately $ 400 per month. No interest rate was stipulated and no term was agreed upon. After having given petitioner the money to purchase his "dream" car at the beginning of November 1982, the story is that Mr. Rivers and petitioner quarrelled so heatedly that Mr. Rivers was forced to move out of their house toward the end of the month. It was then, so the story goes, that Mr. Rivers became concerned by the possibility that petitioner would "renege" on their agreement and he drafted a "loan agreement" which they both executed on December 12, 1982, *33 in the home of a mutual friend, Mr. Carl Blunt, in the presence of two witnesses, Ms. Sharon Palmer and Mr. Tony A. Williams. Mr. Rivers described the latter person as a "hairstylist," who lived in "Warrensville Heights," who was stocky and who wore his hair in a "Jerry-curl [sic]." At trial, petitioner introduced for identification a copy of a document entitled "loan agreement," which both petitioner and Mr. Rivers identified as a copy of the loan agreement prepared by Mr. Rivers. There was other testimony concerning the "loan agreement" at trial but petitioner never sought its introduction into evidence. After trial, petitioner made a motion asking the Court to admit the loan agreement into evidence. However, petitioner's attorney wrote the Court on the following day and withdrew the motion. As the record in this case now stands, therefore, there was much testimony about the loan agreement at trial but the loan agreement itself is not part of the record. Nevertheless, respondent produced a witness at trial, a Mr. Tony L. Williams, who matched the same general description given by Mr. Rivers of the Mr. Tony A. Williams who allegedly witnessed the loan agreement. Respondent's *34 witness testified that he was a hairstylist, that he had worn his hair in "Jerry curls [sic]," that he had lived in Warrensville Heights and that he had known petitioner. He testified that he had never signed a loan agreement between petitioner and Mr. Rivers, that he had never seen the loan agreement introduced by petitioner in this proceeding until shortly before trial, and that it did not bear his signature. In any event, the story told by petitioner and Mr. Rivers is that the latter decided to quit his job at Dalton in approximately April 1983 with the intention to "just relax for a little while, and then to seek other employment." According to Mr. Rivers, he knew that he "wouldn't have an income for a while," so he asked petitioner: if he would take over paying my half of the house note as well as my half of the utilities bills and upkeep for the house, and if he did that, then he wouldn't have to pay me the money toward the car.
Apparently, Mr. Rivers felt comfortable relying upon petitioner despite their violent argument only a short time before and despite petitioner's meager earnings. Petitioner testified that as of May 1983 he "assumed full responsibility" *35 for paying the mortgage, utility bills, and maintenance charges on the house and has paid those costs until the time of the trial. The story ends with testimony that petitioner repaid $ 32,574.14 to Mr. Rivers prior to August 17, 1985, the date of respondent's 30-day letter proposing transferee liability against petitioner. First, petitioner and Mr. Rivers claim that petitioner made one payment of approximately $ 400 to Mr. Rivers prior to execution of the loan agreement on December 12, 1982, and at least three payments prior to May of 1983. Second, they claim that beginning in May of 1983, petitioner paid Mr. Rivers' share of the mortgage payments, maintenance costs, and utilities on their Shaker Heights house. Third, they claim that petitioner paid $ 5,000 to their mutual attorney for Mr. Rivers' legal fees. Finally, they claim that petitioner gave Mr. Rivers possession of the Mercedes sometime after Mr. Rivers was released from prison and, thereafter, relinquished the proceeds from the sale of the car in the amount of $ 18,000. Set forth below is a summary of the alleged "repayments" on the alleged loan of $ 28,000 aggregating $ 32,574.14 which petitioner claims to have made *36 to or on behalf of Mr. Rivers from November of 1982 through August of 1985: 1982
1983
1984
1985
Mortgage Payments
946.56
2,946.80
2,536.92
3,500.00
3,018.00
1,500.00
Mtg. pmts. 5-1-83
3,893.36
6,036.92
4,518.00
to 9-17-85
Mr. Rivers' 1/2
1,946.68
3,018.46
2,259.00
share of mtg.
Utilities -- 5 mos.
750.00
at $ 150
Loan pmt.
400.00
on 11-1-82
Other loan
1,200.00
payments
Legal fees
5,000.00
Proceeds --
18,000.00
Mercedes sale
Alleged
Repayments
400.00
8,896.68
3,018.46
20,259.00
32,574.14
As shown above, it appears that $ 400 of the alleged repayments was paid in 1982, $ 8,896.68 was paid in 1983, $ 3,018.46 was paid in 1984, and $ 20,259 was paid in 1985. There are a number of material inconsistencies which we observe in petitioner's story. First, we find it difficult to understand why petitioner would plead no contest to a criminal charge of receiving stolen property if "he had no knowledge of the embezzled income," as claimed in his September 9, 1985, affidavit, if he had entered into a loan agreement to repay the money, and if he had, in fact, already made four or five payments before his arrest *37 in October of 1983. Under Ohio Rev. Code Ann. section 2913.51(A), an element of the crime of receiving stolen property is knowledge or reasonable cause to believe that the property is stolen. Second, neither petitioner's affidavit of September 9, 1985, nor Mr. Rivers' affidavit of June 22, 1986, mentions petitioner's alleged verbal agreement to repay $ 400 per month nor, more significantly, does either affidavit mention a written loan agreement between the parties. Indeed, petitioner stipulated at trial that his attorney, Ms. Sandra Walker, who represented him before the Internal Revenue Service, did not recall seeing the loan agreement. Rather, petitioner's affidavit refers to "paying Marvin A. Rivers [sic] past credit card debts" and Mr. Rivers' affidavit refers to "paying off" credit cards and legal expenses and selling the car to pay other debts. Interestingly, no part of the alleged repayments of $ 32,574.14 consists of Mr. Rivers' credit card debts. Third, and perhaps the most serious inconsistency, is the fact that petitioner claims in this proceeding to have repaid $ 32,574.14 to Mr. Rivers before August 17, 1985. However, petitioner's affidavit, dated September 9, *38 1985, does not say that. We are at a loss to understand why. Significantly in this regard, petitioner's story at trial is that, as of September 9, 1985, the date of petitioner's affidavit, Mr. Rivers had taken the Mercedes Benz into his possession and control but the title to the car remained in petitioner's name. Petitioner's affidavit does not disclose that fact to the Internal Revenue Service. We can infer either that petitioner's present claim that he had returned the car to Mr. Rivers is not true or that petitioner deliberately failed to disclose that fact to respondent. Either inference is of no help to petitioner in this case. Moreover, petitioner's testimony concerning the transaction was vague and contradictory. For example, petitioner testified on cross-examination as follows: Q. Now, I'm concerned about the fact that this document which is titled loan agreement just refers to $ 27,000 rather than $ 28,000, why is that? You've already agreed that you borrowed $ 28,000. A. Would you repeat that please? Q. The loan agreement only makes reference to $ 27,000, why is that? A. Because $ 1,000 was my personal money. Q. $ 1,000? A. Of this was my personal money. *39 Q. $ 1,000 of what? A. Of the money that I paid the loan, was my personal loan, with my personal earnings. Q. Do you know how much the mercedes [sic] cost? A. Yes, I know how much it cost. Q. How much did it cost? A. I think I paid $ 29,000 off hand. I think it was 29 something at the time. Q. And part of it was your money and part of it was Mr. Rivers [sic] money? A. No. He gave me the full amount. Q. He gave you how much? A. He gave me the full total of the $ 29,000 whatever, and the $ 1,000 that I had of my own personal, I gave toward him, to him toward. Q. And that's all you had to contribute toward the mercedes [sic]? A. At that time. When I first got the car and then before I set up the payments of $ 411. Q. All right. The difference between the $ 29,000 and $ 1,000 is $ 28,000, but the loan agreement only makes reference to $ 27,000? A. Well, like I say, I had already made $ 411 payment. I had already started making payments. I gave him one before I picked up the car and I think two, maybe three after that, after the fact $ 411. Q. How many, and these are payments you made on a monthly basis? A. A month or month and a half basis. Q. Month *40 or month and a half? A. Yes. Q. How many months are there between November and December? A. How many is [sic] there? Q. Yes. A. Two months. November, December. Okay. The car was purchased in February, I mean the car was sold in February. I bought the car in, I can't remember when I bought the car. It's in the Petition. Q. Does November 2nd, jog your memory of '82? A. It might of -- I don't know off hand when I bought -- it's in the Petition when I purchased the car. Similarly, petitioner testified that the "loan agreement" was executed after Mr. Rivers left Dalton. To the contrary, however, Mr. Rivers left Dalton in May 1983, and was still employed there on December 2, 1982, when the "loan agreement" was allegedly executed. After a recess, petitioner changed his testimony on this point and stated that the agreement was executed while Mr. Rivers was still at Dalton. Petitioner did not offer a clear explanation for this change. The credibility of petitioner's testimony can also be judged from the following exchange with respondent's attorney on cross-examination: Q. What was your income in 1982? A. 1982? I would say about $ 18,500 at that time, plus side *41 jobs I was doing. Q. Pardon me? A. Plus other income that I was doing on the side. Q. What other income on the side did you have? A. I was doing private tutoring in my home, and I'm a singer, and I would sing at different weddings and so forth for extra income. Q. So, you were singing at weddings and did private tutoring? A. Yes. Q. How much did that supplement your income? A. Well, with both of them, I made about 4 something for the tutoring and the singing combined together. Q. Four something a month? A. $ 400, not $ 400 a month, like $ 150 a month. Q. An extra $ 150 for private tutoring and singing?A. Yes. * * * Q. Regarding this extra income that you got singing and working as a special eduction teacher, did you report that on your income tax returns? A. Did I? Well, the private tutor was like a personal, it was friends of mine that had friends that needed private tutor. Q. The question is, did you report that on your income tax returns? A. Yes. At that time that I was doing it. Q. How did you keep track of it? Did you keep records or what did you do? A. I kept records because when I was staying with Mr. Rivers he set up a book as I started *42 keeping. Q. So you kept records of all that extra income? A. Yes. Q. Did you give receipts for it? A. I most certainly did. Q. And then you reported that information on your returns? A. Yes. Respondent's attorney then introduced petitioner's 1982 income tax return into evidence. That return reports gross income consisting entirely of petitioner's teacher's salary; it reports no outside income. After that, petitioner made the following attempt to retract his early testimony: THE COURT: Mr. Hamilton, referring to Exhibit F, as I understand [it,] your testimony is that you reported additional income on sources other than employment in the amount of approximately $ 150 a month. THE WITNESS: Yes, but not 1982, your honor. THE COURT: As I recall, the question was 1982 income. THE WITNESS: No, I misunderstood. MS. GRAY: It was 1982. THE WITNESS: Well, I'm sorry. I just started private tutoring, not in '82. THE COURT: When are you referring to? THE WITNESS: Okay, just for the last three almost four months. Not, the years of '82. I misunderstood you, not in '82. THE COURT: You're talking about the last three or four months of this year? THE WITNESS: Yes. *43 I just started private tutoring. I didn't do it in '82, and other years that you showed me in the W-2 forms. THE COURT: So you propose to correct your testimony at this point? THE WITNESS: Yes, because I misunderstood her because I wouldn't have told her in '82. It's not on my form. I just stated doing private tutoring on the side, and if you said '82, that was my misunderstanding. Not in '82 or '83.
We could point to similar inconsistencies in Mr. Rivers' testimony. Suffice it to say that, in our view, the story told by both petitioner and Mr. Rivers is incredible. We are not required to accept unpersuasive testimony of interested parties or witnesses, even if it is uncontradicted. Smith v. Commissioner, 800 F.2d 930, 935 (9th Cir. 1986), affg. T.C. Memo 1984-661; Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., 546 F.2d 530, 539-540 (3d Cir. 1976); Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. T.C. Memo 1967-85; Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Archer v. Commissioner, 227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this *44 Court dated February 18, 1954; Weiss v. Commissioner, 221 F.2d 152, 156 (8th Cir. 1955), affg. T.C. Memo 1954-51; Davis v. Commissioner, 88 T.C. 122, 143-144 (1987), affd. 866 F.2d 852 (6th Cir. 1989); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). We suspect that petitioner knew that Mr. Rivers had embezzled the money used to purchase the Mercedes and we suspect that petitioner did not have "good faith" when he received the money from Mr. Rivers, as required under the definition of "fair consideration." Ohio Rev. Code Ann. sec. 1336.03(B). We come to this conclusion as an inference from various facts in this case, including but not limited to, petitioner's close personal relationship with Mr. Rivers, his plea of no contest to and conviction of receiving stolen property, and his inability to provide a reasonable explanation for the transfer. In any event, we do not believe that petitioner agreed to repay the money to Mr. Rivers either verbally or in writing and we reject the testimony of petitioner and Mr. Rivers that they intended the transaction to constitute a loan. Accordingly, we find that Mr. Rivers transferred the subject money to petitioner without "fair *45 consideration." We further find, as the parties stipulated, that Mr. Rivers was insolvent before the transfer to petitioner or was rendered insolvent by the transfer. Therefore, we find that the transfer of $ 28,000 by Mr. Rivers to petitioner constituted a conveyance "fraudulent as to creditors" within the meaning of section 1336.04 of the Ohio Rev. Code Ann., and that respondent has met his burden of proving that petitioner is Mr. Rivers' transferee and is liable for the deficiencies in, additions to, Mr. Rivers' 1982 income tax. A final point must be addressed. In his pre-trial memorandum, petitioner set forth the following alternative contention: In the alternative if the court should find that the evidence does not support the petitioner's contention the [sic] value of repayments by the petitioner to the transferor should be offset against the proposed liability. For this aspect of the case, the petitioner relies upon the holding in the case entitled Louise Noell vs. Commissioner, 26 [sic] T.C. 329 and 22 T.C. 1035.
The case cited by a petitioner, Noell v. Commissioner, 24 T.C. 329 (1955), supplementing 22 T.C. 1035 (1954), appeal dismissed 234 F.2d *46 665 (8th Cir. 1956), is one in which the Court recognized "the rule that a retransfer to the transferor prior to an attack against the transferee by the creditors of the transferor relieves the transferee from liability * * * [whereas] a retransfer after attack has no such affect." Noell v. Commissioner, 24 T.C. at 330; see also Bellin v. Commissioner, 65 T.C. 676, 684 (1975); Mendelson v. Commissioner, 52 T.C. 727, 735-736 (1969); Ginsberg v. Commissioner, 35 T.C. 1148, 1155-1156 (1961), affd. 305 F.2d 664 (2d Cir. 1962); Gobins v. Commissioner, 18 T.C. 1159, 1174 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954); Eyler v. Commissioner, T.C. Memo 1987-123, on remand from 760 F.2d 1129 (11th Cir. 1985), affg. in part and revg. on other grounds and remanding T.C. Memo 1983-397; McLellan v. Commissioner, T.C. Memo 1975-15; United States v. Brand, 346 F. Supp. 279, 283 (N.D. Ohio 1972). In Noell v. Commissioner, supra, we recognized this rule as part of the fraudulent conveyance law of the State of Missouri, which was applicable to the taxpayer in that case. Noell v. Commissioner, supra, citing Schneider v. Patton, 175 Mo. 684, 75 S.W. *47 155 (1903), and G. Glenn, Fraudulent Conveyance and Preferences, sec. 57 (rev. ed. 1940). The same rule is applicable under Ohio law: a transferee who, in good faith, restores the fraudulently transferred property to the transferor before a creditor commences proceedings against the transferee is exonerated from further liability. Hallowell & Co. v. Bayliss, 10 Ohio St. 536 (1860); Swift v. Holdridge, 10 Ohio 230 (1840). See also Robertson v. Desmond, 62 Ohio St. 487, 57 N.E. 235 (1900), which applied the same principle in the analogous case of a transfer to preferred creditors. Petitioner's post-trial briefs do not address this alternative contention. Petitioner does not argue that he retransferred the money to Mr. Rivers in good faith before receiving notice from respondent and that he should be relieved of liability to that extent. Rather, he argues that the repayments prove that the transfer constituted a loan in the first place and that the transfer was supported by "fair consideration" under Ohio law, and thus, was not a fraudulent conveyance under Ohio Rev. Code Ann. sec. 1336.04. His opening brief states as follows: Hamilton's actions since November 1, 1982 *48 support the premis [sic] that his promise to Rivers was a valuable or fair consideration, thereby removing the conveyance from the purview of section 1336.04 of the Ohio Revised Code.
His reply brief states as follows: The promise to repay the $ 28,000.00 by the Petitioner and the subsequent repayment amount to a fair consideration as required by Ohio Revised Code Section 1336.03. Therefore, the conveyance is not fraudulent under Chapter 1336 of the Ohio Revised Code.
By reason of petitioner's failure to pursue the alternative contention described above, we deem it to have been conceded or abandoned and we do not consider it. Rule 151(e)(2), (4) and (5), Tax Court Rules of Practice and Procedure; Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Stringer v. Commissioner, 84 T.C. 693, 706-707 n.8 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986); Ideal Basic Industries, Inc. v. Commissioner, 82 T.C. 352, 396 (1984); Trust Under Will of Mabury v. Commissioner, 80 T.C. 718, 730 n.8 (1983); Guzzetta v. Commissioner, 78 T.C. 173, 184 n.18 (1982). Moreover, if we were to consider it, the result would be the same because *49 petitioner has not shown a necessary element under Ohio law for application of the retransfer rule, good faith. In order to be relieved from liability, petitioner would be required to prove that the retransfer was made in "good faith." See Swift v. Holdridge, supra. As we noted in Gobins v. Commissioner, supra, at 1174, a retransfer resulting from collusion between the parties would also be in fraud of creditors. See Mendelson v. Commissioner, supra, at 735. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
*. 50 percent of the statutory interest on $ 17,782.37. ↩
**. 50 percent of the statutory interest on $ 8,248.00.↩