ESTATE OF CALISTA B. DOWLIN, DECEASED, LYNN PHILLIPS, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Dowlin v. Commissioner
Docket No. 26008-91
United States Tax Court
T.C. Memo 1994-183; 1994 Tax Ct. Memo LEXIS 194; 67 T.C.M. (CCH) 2750; April 28, 1994, Filed *194 Decision will be entered under Rule 155. For petitioner: Robert E. Glaser and Cynthia C. Schafer
For respondent: John E. Budde
CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiency in, and additions to, petitioner's Federal estate tax: Additions to Tax
Section Section Section Section Deficiency
[1] 6651(a)(1)  6653(a)(1)(A) 6653(a)(1)(B) 6660(a) $ 284,139
$ 65,712
$ 14,207
*
$ 65,239
The issues remaining for decision are: (1) What was the value of certain real property (the residence) owned by Calista B. Dowlin (decedent) on *195 the date of her death? We find and hold that its value was $ 270,000. (2) Is the decedent's estate (the estate) entitled to deduct as administration expenses under section 2053(a) certain expenses incurred with respect to the residence and extraordinary executrix' commissions? We hold that it is not. (3) Is the estate liable under section 6651(a)(1) for the addition to tax for failure to file timely its estate tax return? We hold that it is. (4) Is the estate liable under section 6653(a)(1)(A) and (B) for the additions to tax for negligence? We hold that it is. (5) Is the estate liable under section 6660(a) for the addition to tax for a valuation understatement? We hold that it is to the extent stated herein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [2]
At the time the petition was filed and at all times relevant to the instant case, Lynn Phillips (Ms. Phillips), the decedent's daughter and executrix of the estate, resided in Bloomington, Indiana. *196 Decedent died estate on March 27, 1988. Except for two specific bequests totaling $ 15,000, decedent left the residue of her estate, including the residence, to Ms. Phillips. Decedent gave the executrix the power to sell any of decedent's property. As executrix, Ms. Phillips generally paid the expenses relating to the estate. At the time of her death, the personal property of decedent that was includible in the gross estate for Federal estate tax purposes was worth approximately $ 1,000,000. This property was more than adequate to pay decedent's debts at the time of her death as well as expenses incurred by the estate. The Residence
From 1936 until her death, decedent lived at the residence which is located in Jackson Township in Stark County, near Canton, Ohio. The residence consisted of 3.75 acres of land comprised of two adjacent parcels. At the time of decedent's death, no improvements were on the parcel consisting of 1.32 acres. The house in which decedent resided until her death (the house) is situated on the other parcel consisting of 2.43 acres. The house, which has 4,601 square feet and which was built of brick in colonial style in 1928, contains a foyer, *197 a living room, a library/family room, a dining room, a kitchen, a butler's pantry, seven bedrooms, four and a half bathrooms, seven fireplaces, a green house, an enclosed patio, a full basement, a third-floor attic, a two-level screened porch, and an attached two-car garage. It is heated by oil-burning furnaces. The neighborhood in which the residence is located is one of the most affluent in the Canton, Ohio, area. At the time of decedent's death, the house was in a neglected condition. By way of illustration, paint and wallpaper on the interior of the house were peeling and loose, plaster was cracked, floors were dirty, screens for the porch were torn, shutters were missing or deteriorated, doors were warped, and baseboards were separated from the floors. At the time of, and for some time prior to, her death, decedent was using only her bedroom and the library, and a housekeeper was using the kitchen and living in a room over the garage. The rest of the house was not being used. When she died, decedent had in effect a homeowner's insurance policy (insurance) that insured the house for $ 497,000. The executrix renewed that policy after decedent's death. It was not necessary *198 to sell the residence to pay the estate's debts. A decision was made to sell it because Ms. Phillips did not want to live there. In order to be in a better position to sell the residence, the executrix began repairing the house in November or December 1988. The repair work performed included painting the house inside and out, replastering or installing dry wall, and refinishing the floors. On June 8, 1989, Ms. Phillips and her husband applied to The Central Trust Company (Central Trust) for a line of credit secured by a mortgage on the residence. On their loan application, they listed the residence as an asset with a value of between $ 700,000 and $ 1,000,000. Ms. Phillips recorded her ownership interest in the residence with Stark County on June 27, 1989, because Central Trust required that she do so as a condition of its extending credit to her and her husband. Central Trust extended a $ 200,000 line of credit secured by a mortgage on the residence. Between the date of decedent's death on March 27, 1988, and the date on which Ms. Phillips' interest in the residence was recorded with Stark County on June 27, 1989, the estate incurred a variety of expenses with respect to *199 the residence, including a total of $ 8,814 paid to the housekeeper whom Ms. Phillips continued to employ and who lived at the residence until May 1989 and $ 6,046 paid to State and Federal governments relating to the housekeeper's employment. Between July 14, 1988, and June 14, 1989, Ms. Phillips paid $ 2,448 for lawn care and snow removal. On February 11, 1989, she paid $ 1,613 for homeowner's insurance. Between April 18, 1988, and June 14, 1989, she paid $ 3,228 for heating oil for the house. Between April 2, 1988, and February 27, 1989, she paid $ 530.35 for electricity at the house. Between July 14, 1988, and March 19, 1989, she paid $ 263.67 for telephone service at the house. In the fall of 1989, the house served as a designers' show house for a local hospital's fundraising activity (the fundraising event). Thereafter in 1989, Ms. Phillips listed the residence for sale at $ 849,000 and continued to have renovations made to the house that had not been completed before the fundraising event. Once the fundraising event was over, the house was vacant, and the insurance on it was canceled. In 1990, the asking price for the residence was lowered to $ 659,000. On July 26, *200 1991, the residence was sold to Thomas C. and Ruth A. Moser (the Mosers) for $ 360,000. [3]
The Estate Tax Return
Ms. Phillips as executrix retained Alan Segedy (Mr. Segedy), an attorney, to assist her in the administration of decedent's estate, including the preparation of the estate's tax returns. The original due date of the estate's Federal estate tax return (the return) was December 27, 1988. The estate obtained an extension of the due date until March 1, 1989. No other request for an extension of the due date was made. On January 4, 1989, the estate paid the Internal Revenue Service (the Service) $ 119,821.26 with respect to its estate tax liability. The return was filed on July 3, 1989. Ms. Phillips and her husband met with Mr. Segedy in Canton, Ohio, for the purpose of reviewing a draft of the return (the draft return) that he was preparing for the estate on her behalf. The draft return claimed as deductions certain expenses, *201 the amounts of which Mr. Segedy had estimated. Ms. Phillips did not know the source for Mr. Segedy's estimates and did not believe that they were correct. She was also concerned about the deduction of certain types of expenses estimated in the return that had not yet been incurred, such as expenses for selling the residence. Since Ms. Phillips was concerned about the estimated expenses claimed as deductions in the draft return, she asked Mr. Feeley, another attorney in Canton, to review it. Although Ms. Phillips believed that the estimates in the draft return were wrong, she signed it and gave it to Mr. Segedy to file as the Federal estate tax return for the estate. The return, as filed on July 3, 1989, shows a date of "2/27/89" that was typed in the space next to Ms. Phillips' signature and a date of "2/25/89" that was typed in the space next to Mr. Segedy's signature. Ms. Phillips denies having signed the return on February 27, 1989. On August 25, 1989, Mr. Segedy wrote a letter (August 25 letter) to the Service, showing that a copy was sent to Ms. Phillips, in which he attributed the late filing of the return to problems encountered with valuation of the estate's assets *202 and to the determination of debts and costs of administration. Respondent's Determinations
In the notice of deficiency (notice), respondent made various determinations, a number of which have been conceded by the estate or by respondent. Still in dispute are respondent's determinations that the fair market value of the residence as of decedent's death was not the $ 125,000 claimed in the return and that certain expenses incurred with respect to the residence and claimed as deductions in the return are not deductible administration expenses. Although the estate has conceded that the amounts of such claimed deductions are wrong, it maintains that it is entitled to deduct the correct amounts of such expenses, viz., utilities, insurance, alleged caretaker services, and other similar items. Also in dispute are respondent's determinations in the notice that the estate is liable for the additions to tax for failure to file timely the return, for negligence, and for a valuation understatement and the estate's claim not made in the return that it is entitled to deduct $ 12,000 of extraordinary executrix' commissions. [4]
*203 OPINION The estate bears the burden of demonstrating error in respondent's determinations and in establishing its entitlement to the $ 12,000 in extraordinary executrix' commissions that it is now claiming. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Pasternak v. Commissioner, 990 F.2d 893, 902 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; Estate of Muhammad v. Commissioner, 965 F.2d 520, 521, 523 (7th Cir. 1992), affg. T.C. Memo. 1990-211. 1. Valuation of the Residence
Property includible in a decedent's gross estate generally is to be valued as of the date of decedent's death. [5] Sec. 2031. The issue we must decide is the fair market value of the residence on March 27, 1988, the date of decedent's death. The *204 fair market value of property on a particular date is a question of fact. Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Barry v. United States, 501 F.2d 578, 580 (6th Cir. 1974). The determination of the value of property is a matter of judgment, rather than of mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347; see also Oak Woods Cemetery Association v. Commissioner, 111 F.2d 863, 867 (7th Cir. 1940), affg. 38 B.T.A. 121 (1938) and Evergreen Cemetery Association v. Commissioner, a Memorandum Opinion of the Board of Tax Appeals dated July 5, 1938. Moreover, since valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific evidence, provided that it is within the range of figures that properly may be deduced from the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), *205 affg. T.C. Memo. 1974-285; Hamm v. Commissioner, supra at 939-940. Respondent relies on the opinion of an expert to support her position as to the fair market value of the residence as of the date of decedent's death. In advancing its position, the estate does not rely on any experts. [6]
*206 We evaluate the opinion of respondent's expert in light of her qualifications and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986). The persuasiveness of an expert's conclusion depends largely upon the disclosed facts on which it is based. See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244. We are not bound by the formulae and opinions proffered by an expert, especially when they are contrary to our judgment. Orth v. Commissioner, supra; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139. Instead, we may reach a decision on value based on our own analysis of all the evidence in the record. Silverman v. Commissioner, supra *207 Hamm v. Commissioner, supra at 940-941. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. We may also reject the opinion of an expert in its entirety. Orth v. Commissioner, supra; Parker v. Commissioner, supra at 562-565. Even if only one party proffers the opinion of an expert, such as is the case here, we are not required to accord that opinion total or even partial acceptance. Tripp v. Commissioner, supra; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Where the opposing party clearly shows to our satisfaction a significant error in that opinion, appropriate adjustments will be made. Estate of Gilford v. Commissioner, supra.
Before turning to our consideration of the value of the property at issue in this case, *208 we restate the Court's view that questions of fair market value, like that at issue here, are generally more appropriately resolved through the give and take of settlement negotiations by the parties, rather than adjudication. Buffalo Tool & Die Mfg. Co. v. Commissioner, supra at 451. In the absence of such a resolution in the present case, we are left to decide the fair market value of the residence. In so doing, we will decide what weight is to be given the expert opinion proffered by respondent. a. The Estate's Position
The estate contends that the fair market value of the residence on the date of decedent's death was $ 125,000, the value claimed in the return. That value seems to have been based on an appraisal of the residence that had been made by Mr. Kaess for the Ohio probate proceedings. In making that appraisal, Mr. Kaess inspected the house in which decedent had lived and reviewed local property tax records relating to the residence that indicated that the assessed value of the decedent's house and the parcel on which it was located was $ 125,800. [7]
*209 It is generally recognized that the value at which real estate is assessed for local tax purposes is not necessarily a reliable indicator of fair market value. Tabor Mfg. Co. v. Commissioner, 34 F.2d 140 (3d Cir. 1929), vacating and remanding 10 B.T.A. 1197 (1928); Frazee v. Commissioner, 98 T.C. 554, 562-563 (1992); Estate of Lippincott v. Commissioner, 27 B.T.A. 735, 740 (1933), revd. on other grounds 72 F.2d 788 (3d Cir. 1934). In fact, section 20.2031-1(b), Estate Tax Regs., provides: "Property shall not be returned at the value at which it is assessed for local tax purposes unless that value represents the fair market value as of the applicable valuation date." Therefore, we will not accept the assessed value of the residence as its fair market value unless the estate demonstrates that such assessed value is in fact the fair market value of that property as of the date of decedent's death. Not only did the estate fail to make such a showing, but respondent introduced evidence, including the testimony of her expert and of Robert *210 P. Graham II (Mr. Graham), that satisfies us that the assessed value of the residence did not represent its fair market value as of decedent's death. Mr. Graham, who was at the time of trial the chief appraiser for Stark County where the residence is located, administered the mass appraisal system that had been used by that county since the early 1980s to assess real property for local tax purposes. He testified that, under that system, each real property to be assessed is not individually examined and analyzed. Instead, a computer model is utilized to estimate the sales price for each property. That estimated sales price is used as the assessed value for local real property tax purposes. According to Mr. Graham, under Stark County's system, the assessed value for the residence determined by using the computer model would not have been checked further. Mr. Graham also testified that the mass appraisal system used by Stark County did not generate a reliable estimate for houses with over 2,500 square feet in area, such as the residence which has 4,601 square feet, and that larger houses tended to be under appraised by that system. Mr. Graham expressed his view that the assessed *211 value of the residence that had been established by Stark County for 1988 was significantly underestimated. However, he did not indicate what he thought the correct assessed value should have been. On the instant record, we conclude that the value at which the residence was assessed for local real property tax purposes for 1988 did not reflect its fair market value as of decedent's death. Consequently, we reject Mr. Kaess' appraisal of the residence, which was based in part on that assessed value. We also reject the $ 125,000 amount which was claimed by the estate in the return as the fair market value of the residence and which in turn appears to have been based on Mr. Kaess' appraisal. In this connection, we note that, in addition to the testimony of respondent's expert, certain of the parties' stipulations suggest that the value of the residence on March 27, 1988, the date of decedent's death, exceeded the amount stated in the return. [8] At the time of her death, decedent maintained insurance on the house in the amount of $ 497,000. Ms. Phillips maintained this coverage after decedent's death. On June 8, 1989, Ms. Phillips and her husband applied for a mortgage loan secured *212 by the residence. On their loan application, Ms. Phillips and her husband listed the residence as an asset with a value ranging from $ 700,000 to $ 1,000,000. They received a $ 200,000 line of credit secured by a mortgage on the residence. In 1989, Ms. Phillips offered the residence for sale at $ 849,000. In 1990, the offering price was reduced to $ 659,000. In 1991, the residence was sold for $ 360,000. Ms. Phillips attempted at trial to disavow these various claimed values. Although such claimed values do not, standing alone, establish the *213 fair market value of the residence as of the date of decedent's death, they undermine the reliability of the fair market value claimed in the return, since they seem to have varied depending on the purpose for which each was used. They also suggest to us that the residence had a value higher than that claimed in the return. b. Respondent's Position
Respondent argues that the fair market value of the residence on the date of decedent's death was $ 299,000. [9] In advancing this position, respondent relies on an expert, Lorine A. Bohazi (respondent's expert), a valuation engineer employed by the Service. Respondent's expert valued the residence by using a method that she determined was best suited for valuing the property at issue, viz., by examining the sales during 1988, the year of decedent's death, of three properties that she considered to be comparable to the residence (the comparable properties).[10] (For convenience, we shall sometimes refer to each of the comparable properties by the designations used by respondent's expert in her report, viz., comparable property 1, comparable property 2, and comparable property 3.) Before turning specifically to the method used by *214 respondent's expert, we note that evidence of sales of comparable properties generally is persuasive evidence of fair market value when offered in support of an expert's opinion. First National Bank v. United States, 763 F.2d 891, 896 (7th Cir. 1985). We now focus on the analysis undertaken by respondent's expert in determining the fair market value of the residence. She examined sales of other "capacious, pre-depression, 'gracious'" properties located in the vicinity of the residence. Respondent's expert attempted to, and did, find sales of properties that had been built *215 within five years of the time during which the residence was built and that had features similar to it. In 1993, respondent's expert personally viewed the exterior of each of the comparable properties and the interior and exterior of the residence. Respondent's expert did not view the residence in 1988. She obtained information concerning the residence and the comparable properties from Stark County records. Respondent's expert was provided information concerning the condition of the residence as of the date of decedent's death by representatives of the estate and by a structural engineer who had inspected the residence sometime in 1988 after decedent died. She obtained information concerning the condition of the comparable properties as of the times in 1988 that they were sold from Stark County records and sales listings. She then proceeded to make adjustments to the sales prices of those properties to reflect any differences (e.g., lot size, quality of location, condition of house, heating and cooling systems, amount of garage space, and number of fireplaces) between them and the residence. For instance, respondent's expert reduced the sales price of each of the comparable *216 properties by an amount as high as $ 90,000 and no lower than $ 60,000 to take account of the effect that the neglected condition of the residence had on its value as of decedent's death. After making adjustments to reflect any differences between the residence and the comparable properties, respondent's expert divided the adjusted sales price of each of the comparable properties by the square foot area of the house situated on each such property in order to arrive at the adjusted sales price per square foot of each property. She multiplied each of those quotients by the square foot area of the house situated on the residence in order to arrive at a figure derived from the sale of each of the comparable properties that she believed was an indication of the fair market value of the residence. Respondent's expert concluded that comparable property 1 in particular was most similar to the residence in various characteristics, including architectural style, age, and overall "presence". She therefore placed greatest reliance on the indication of fair market value that she derived from the sale of that property in determining that the fair market value of the residence as of the date *217 of decedent's death was $ 299,000. The estate argues that the report of respondent's expert contains flaws that render it merely "an intellectual exercise" unrelated to the residence's fair market value as of decedent's death. It appears to contend that the properties selected by respondent's expert are not comparable to the residence and that respondent's expert did not adequately adjust the sales price of each of the comparable properties to take account of the differences between each of those properties and the residence. While we reject the first of the estate's contentions, we find that certain additional adjustments to the sales prices of the comparables are needed to arrive at a more accurate indication of the fair market value of the residence. The estate does not dispute that the residence and each of the comparable properties are generally comparable in that they are all "capacious, pre-depression, 'gracious'" properties that are similar in construction and are located in the same general vicinity. Nor does the estate contend that the sales of the comparable properties occurred too far from the valuation date to be useful indicators of value. Rather, the estate focuses *218 on certain features relating to each of the comparable properties that it claims are not properly reflected in the valuation undertaken by respondent's expert and that therefore render comparison of the residence and the comparable properties not useful in deciding the fair market value of the residence. By way of illustration, the estate contends that comparable property 2 was in a controlled-access community, while the residence was not, and that this fact was not reflected in the adjustments made by respondent's expert. We disagree. Respondent's expert reduced the sales price of that property by $ 50,000 to take account of its better location. The estate further asserts that respondent's expert did not consider the effect of different modes of financing in valuing the residence. That assertion ignores the fact that respondent's expert eliminated any such effect by basing her determination of the fair market value of the residence in terms of cash or cash equivalents and by relying on sales of comparable properties that occurred in the same money market and in close proximity to the date of decedent's death. The estate also contends that respondent's expert failed to consider *219 availability of utilities, such as municipal water and sewer service, to the residence in comparison to the comparable properties. Respondent's expert testified that municipal water and sewer lines ran in proximity to the residence as of the date of decedent's death. Thus, we find that respondent's expert did consider the availability of utilities to the residence in the process of arriving at her determination of its fair market value. She also made a downward adjustment to the sales price of each of the comparable properties to reflect the fact that the residence used oil for heating while the comparable properties used gas. In a further attempt to discredit the report of respondent's expert, the estate claims that she did not adequately consider the differences in condition between the house located on the residence and each of the houses situated on the comparable properties because she did not investigate the condition of any of those properties. With respect to the condition of the house on the residence as of the date of decedent's death, respondent's expert testified that she relied on information concerning that condition which was provided to her by representatives *220 of the estate and by a structural engineer who inspected the house in 1988. The estate complains that respondent's expert did not provide any details of the information of that condition which she obtained from the structural engineer. However, counsel for the estate did not see fit to ask for such details during his cross-examination of respondent's expert. We thus will not place any significance on the lack of details in the record. With respect to the condition of the houses on the comparable properties, respondent's expert testified that she relied on statements of condition in realtors' listings and local real property tax records. Based on those statements, she rated the condition of the house on each of the comparable properties as "superior". The estate notes that respondent's expert did not inspect the interior of each such house in preparing her report. We do not think that examining the interior of those houses in 1993, when the report was prepared, would have revealed much about their condition in 1988. The estate implies as much on brief when it contends that the inspection that respondent's expert made of the house on the residence in 1993 could not have disclosed *221 its condition at the time of decedent's death. As part of its contention about the condition of the residence in comparison to that of each of the comparable properties, the estate asserts that respondent's expert did not consider the presence of asbestos in the house situated on the residence or whether its fireplaces worked. Respondent's expert testified that she was aware that a small amount of asbestos was present in the house, but that there was not as much as in other houses of that age. Although respondent's expert acknowledged that she did not know whether the fireplaces in the house were functional at the time of decedent's death, there is no evidence that they were not. [11] It seems to us that the condition of the fireplaces would have been included as part of the information concerning the condition of the residence in 1988 that was provided to respondent's expert by representatives of the estate and by the structural engineer who inspected the residence sometime in 1988 after decedent's death and that therefore their condition would have been taken into account in her report. *222 On the instant record, we conclude that any impact on value due to the condition of the house on the residence as compared to the condition of the houses on the comparable properties was adequately accounted for in the adjustments made by respondent's expert in arriving at her determination of the fair market value of the residence. In this connection, respondent's expert reduced the sales price of each of the comparable properties by an amount as high as $ 90,000 and no lower than $ 60,000 to take account of the inferior condition of the house on the residence when decedent died. We find those adjustments sufficient to take account of any differences in condition between that house and the houses on the comparable properties. [12]
Nevertheless, there are certain other differences between the residence and the comparable properties that we do not believe *223 were adequately taken into account by respondent's expert in arriving at the fair market value of the residence. At trial, respondent's expert admitted that, in developing the indication of value provided by the sale of comparable property 3, she did not take into account the presence on that property of a swimming pool and a four-car attached garage, rather than a three-car attached and one-car detached garage. [13] As of the date of decedent's death, the residence did not have a swimming pool and had only a two-car attached garage. Based on our review of the entire record, in particular our review of the adjustments made by respondent's expert to take account of the presence of a swimming pool on comparable property 1 and additional attached garage space on comparable property 3, we conclude that the adjusted sales price for comparable property 3 that respondent's expert determined should be reduced by a total of $ 8,000 to $ 277,500, or $ 63.22 per square foot, in order to factor in those differences between comparable property 3 and the residence. Multiplying the revised, adjusted sales price per square foot of $ 63.22 by the square foot area of the house situated on the residence *224 (4,601 square feet), we find that the indication of value provided by the sale of comparable property 3 is $ 291,000, rather than the $ 299,500 claimed in the report of respondent's expert. Another difference between the residence and one of the comparable properties about which the estate does not complain, but which we find was not adequately taken into account by respondent's expert, relates to the fact that the residence is 3.75 acres, while comparable property 1 is *225 5.38 acres, or more than one and a half acres larger than the residence. The failure by respondent's expert to account for this difference is not explained and is especially anomalous, since respondent's expert did adjust for the differences in size between the other two comparable properties and the residence. Specifically, respondent's expert increased the sales prices of comparable properties 2 and 3 by $ 40,000 to take account of the fact that the residence is 3.75 acres, while those two properties are only 1.13 and 1.73 acres, respectively. Based on the entire record, in particular our review of the adjustments made by respondent's expert to take account of the fact that comparable properties 2 and 3 are smaller than the residence, we conclude that the adjusted sales price of comparable property 1 should be decreased by $ 25,000 to $ 181,000, or $ 57.13 per square foot, in order to factor in the difference in size (1.63 acres) between that property and the residence. Multiplying the revised, adjusted sales price per square foot of $ 57.13 by the total square foot area of the house situated on the residence (4,601 square feet), we find that the indication of value provided *226 by the sale of comparable property 1 is $ 263,000, rather than the $ 299,000 claimed in respondent's expert report. The revised indications of value provided by the sales of the three comparable properties relied on by respondent's expert are $ 263,000, $ 286,500, and $ 291,000. In arriving at her determination of the fair market value of the residence, respondent's expert placed greatest weight on the indication of value provided by the sale of comparable property 1. We have no reason to disagree. Accordingly, based on the entire record, and using our best judgment, we find and hold that the fair market value of the residence on the date of decedent's death was $ 270,000. 2. Administration Expenses
The estate seeks to deduct as administration expenses under section 2053(a) (a) certain amounts expended by the executrix with respect to the residence between the date of decedent's death (March 27, 1988) and the date she recorded her interest in the residence with Stark County (June 27, 1989) [14] and (b) $ 12,000 in extraordinary executrix' commissions. *227 Section 2053(a) provides that the taxable estate is to be determined by deducting from the gross estate such amounts for funeral expenses, administration expenses, claims against the estate, and indebtedness in respect of property includible in the estate as are allowable by the laws of the jurisdiction under which the estate is being administered. Only certain administration expenses claimed by the estate are at issue here. Section 20.2053-1(a), Estate Tax Regs., sets forth general guidelines for the deductibility of expenses governed by section 2053, including administration expenses. As relevant to the instant case, that regulation provides that deductions are allowed for amounts that are payable out of property subject to claims and that are allowable as administration expenses by the law of the jurisdiction under which the estate is being administered. Sec. 20.2053-1(a)(1), Estate Tax Regs. Section 20.2053-1(b)(2), Estate Tax Regs., provides that the decision of a local court as to the amount and allowability under local law of an administration expense will ordinarily be accepted if the court passes on the facts upon which deductibility depends. That regulation further *228 states that a decree of a local court will not be accepted if the local court does not pass on those facts or if it is at variance with the law of the State. However, a deduction for a reasonable expense of administration will not be denied because no court decree has been entered if the amount would be allowable under local law. Id.
Section 20.2053-3, Estate Tax Regs., sets forth conditions specifically applicable to the deductibility of administration expenses. Section 20.2053-3(a), Estate Tax Regs., provides that amounts deductible from the gross estate as administration expenses are limited to such expenses as are actually and necessarily incurred for the administration of the estate, that is, in the collection of assets, payment of debts, and distribution of property to persons entitled to it. The expenses contemplated under section 2053(a) are those only as attend the settlement of an estate and the transfer of the property of the estate to individual beneficiaries or to a trustee. Id. Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions. *229 Id.
a. Expenses with Respect to the Residence
Respondent disallowed various deductions claimed in the return for expenses incurred by the estate with respect to the residence. After concessions, the only such expenses at issue are those for utilities, insurance, alleged caretaker services, and other similar items incurred between the date of decedent's death (March 27, 1988) and the date on which Ms. Phillips' interest in the residence was recorded with Stark County (June 27, 1989). The amounts of the expenses at issue have been stipulated, and we accept the stipulated amounts. [15] Thus, we must decide only whether the stipulated amounts are deductible administration expenses under section 2053(a). [15]
*230 The expenses with respect to the residence that the estate seeks to deduct are classified as miscellaneous administration expenses by section 20.2053-3(d)(1), Estate Tax Regs. That regulation provides in pertinent part: Expenses necessarily incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate, if it is impossible to effect immediate distribution to the beneficiaries. Expenses for preserving and caring for the property may not include outlays for additions or improvements; nor will such expenses be allowed for a longer period than the executor is reasonably required to retain the property. The estate appears to assume that an appeal from our decision in this case would be to the United States Court of Appeals for the Sixth Circuit, since the probate of decedent's will is subject to Ohio law. [16] Proceeding on that assumption, the estate relies upon Estate of Park v. Commissioner, 475 F.2d 673 (6th Cir. 1973), revg. 57 T.C. 705 (1972), as controlling authority in the instant case for its position that it is entitled to deduct the expenses *231 it is claiming with respect to the residence. [17] *232 In that case, the United States Court of Appeals for the Sixth Circuit allowed the taxpayer to deduct the expenses of selling real estate that had been approved by a Michigan court applying that State's law, even though it was not shown that those expenses were necessary to the administration of the estate as required by section 20.2053-3(a) and -3(d)(2), [18] Estate Tax Regs. In so holding, the Court of Appeals decided that Congress intended that the deductibility of expenses under section 2053(a) be governed exclusively by State law and that therefore the requirements of those regulations that expenses be necessary in order to be deductible under that section are invalid.[19]Id. at 676-677. We do not agree with this interpretation of section 2053(a). Estate of Posen v. Commissioner, 75 T.C. 355, 367 (1980). *233 Even assuming arguendo that the estate were correct in its assumption that an appeal from our decision in this case would lie in the Court of Appeals for the Sixth Circuit and that the Estate of Park case would control the instant controversy, the estate must in any event demonstrate to us that the expenses at issue in the present case are allowable under Ohio law. Like the estate tax regulations involved here, Ohio law permits a Probate Court in Ohio to allow actual and necessary expenses in amounts which that court considers just and reasonable. Ohio Rev. Code Ann. sec. 2113.36 (Anderson 1990). In addition, an executor named in a will may take necessary actions to preserve the estate prior to issuance of letters of appointment. Cf. Ohio Rev. Code Ann. sec. 2109.02 (Anderson 1990). Accordingly, even if, as was held in Estate of Park v. Commissioner, supra, the deductibility under section 2053(a) of expenses incurred by an estate were governed exclusively by State law, the estate would still have the burden of showing in the instant case that the expenses it incurred with respect to the residence were necessary and otherwise allowable under *234 Ohio law. [20]
The estate has made virtually no effort to satisfy its burden. It has not directed our attention to a specific provision or case under Ohio *235 law that would allow the expenses claimed. It introduced no evidence concerning the need for any of the expenses with respect to the residence other than Ms. Phillips' testimony about the cost of employing the housekeeper who continued to live at the residence after decedent's death. She testified that the housekeeper lived at the residence to protect the house from vandalism and to maintain insurance coverage. We note that the housekeeper moved out of the residence in May 1989 when renovation work required the house to be vacant and did not move back into the residence after that work was completed. The insurance was subsequently canceled because the house was vacant. The record does not show that anyone lived at the residence after the housekeeper vacated it in May 1989 and before the Mosers purchased it in July 1991. The fact that Ms. Phillips did not ask someone else to live at the residence after it had been renovated, when the potential for harm resulting from vandalism or lack of insurance would appear to have been greater due to its improved condition, tends to undermine her testimony about the reason why the housekeeper was living there when it was in the neglected *236 condition in which Ms. Phillips found it after decedent's death. The only information in the record concerning expenses other than those related to the housekeeper are amounts, dates, and the identity of payees. The estate appears to believe that this information, coupled with its assertion that it is entitled to deduct those expenses "if they are approved in the Accountings filed and to be filed with the [Ohio] Probate Court" having jurisdiction over the estate (Ohio Probate Court), is sufficient to sustain its burden of proving that the expenses at issue were necessary and otherwise allowable under Ohio law. We disagree. It is noteworthy that the estate has not placed in evidence any Ohio Probate Court order approving the expenses at issue. It seems to us that the estate would have had ample opportunity to secure approval from the Ohio Probate Court prior to the trial of the instant case for the expenses it incurred with respect to the residence between March 27, 1988, and June 27, 1989. Under Ohio law, Ms. Phillips as executrix was required to file an initial account with the Ohio Probate Court nine months after her appointment as executrix and further accounts at least annually *237 thereafter, which set forth all disbursements made during the period covered by the account, unless written waivers were filed by all legatees. Ohio Rev. Code Ann. 2109.30 (Anderson 1990 & Supp. 1992). There is no evidence that the filing of the accounts otherwise required by Ohio law was waived by the legatees under decedent's will, and we therefore assume it was not waived. It thus appears either that the Ohio Probate Court did not allow the expenses incurred with respect to the residence that are at issue here or the estate failed to make an adequate record in the instant case establishing that the Ohio Probate Court did allow those expenses. As required by section 2053(a) and section 20.2053-1(a)(1), Estate Tax Regs., we have examined what we find to be the applicable law of Ohio. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). Ohio is a State in which, upon admission of a will to probate, title to a testator's real property passes by operation of law directly to the devisee, and title is considered to have passed as of the date of death. [21]Central National Bank, Savings & Trust Co. v. Gilchrist, 154 N.E. 811, 812 (Ohio Ct. App. 1926); *238 see Woodbridge v. Banning, 14 Ohio St. 328 (1863); Akron Commercial Secur. Co. v. Ritzman, 72 N.E.2d 489, 492 (Ohio Ct. App. 1945); Nolan v. Kroll, 174 N.E. 750 (Ohio Ct. App. 1930). Title to the residence thus passed automatically to Ms. Phillips, effective as of the date of decedent's death, once decedent's will was admitted to probate. The only indication in the record as to when decedent's will was admitted to probate is the stamp on the will by the Ohio Probate judge showing that the will was filed on May 4, 1988. *239 On the basis of the scant evidence in the record, we cannot conclude that the estate has demonstrated that the expenses at issue with respect to the residence that it incurred from the date of decedent's death (March 27, 1988) to June 27, 1989, were necessary and otherwise allowable expenses of administration under Ohio law. Accordingly, respondent's determination disallowing those expense deductions will be sustained. b. Extraordinary Executrix' Commissions
The estate claims a deduction of $ 12,000 as extraordinary executrix' commissions that it asserts it paid to the executrix, Ms. Phillips, in 1992. Respondent has allowed the estate a deduction for $ 23,000 in executrix' commissions paid to Ms. Phillips and claimed as a deduction in the return. [22] No order of the Ohio Probate Court allowing extraordinary executrix commissions has been obtained. [23]
*240 Section 20.2053-3(b)(1), Estate Tax Regs., provides that executor's commissions not fixed by decree of court are allowable on final audit of the estate tax return if the district director is satisfied that the amount of such commissions will be paid and is allowable under local law and it is the accepted practice in the jurisdiction to allow such an amount for estates of similar size and character. If the deduction is disallowed in whole or part on final audit, it may be subject to modification as the facts may later require. Id.
Where, as is the case here, the total amount of an executor's commission has not been approved by the appropriate State court, we have been willing to allow its deduction where the taxpayer establishes that the amount claimed represents a reasonable estimate of the commissions allowable under local law. [24] Cf. sec. 20.2053-3(b)(1), Estate Tax Regs. *241 Because the extraordinary executrix' commissions have not been approved by the Ohio Probate Court, the estate must establish that they are a reasonable estimate of the commissions allowable under Ohio law. The estate has failed to do so. It merely asserts, as it does with respect to the expenses relating to the residence, that the extraordinary executrix' commissions at issue are deductible "if they are approved in the Accountings filed and to be filed with the Probate Court". Ohio Rev. Code Ann. sec. 2113.36 (Anderson 1990) governs the allowance of extraordinary commissions claimed by an executor in Ohio. [25] When application is made for such an allowance, a Probate Court in Ohio is to consider all services, both ordinary and extraordinary, rendered by the executor. If the commissions payable under the schedule established by Ohio Rev. Code Ann. sec. 2113.35 (Anderson 1990 & Supp. 1992) exceed the reasonable value of ordinary services rendered, the amount of further allowances awarded is to be adjusted so that the total amount of ordinary and extraordinary commissions received is equal to the reasonable value of all services rendered. Ohio Rev. Code Ann. sec. 2113.36. *242 The estate has not placed sufficient evidence in the record to enable us to decide whether it would be reasonable to expect that the extraordinary commission it claims it paid to Ms. Phillips would be allowed under Ohio law. It has not detailed the nature and extent of the services Ms. Phillips provided to the estate, whether ordinary or extraordinary. After decedent's death, she continued to live in Indiana. Although Ms. Phillips, as executrix, was responsible for paying expenses related to the estate, she employed advisers who appear to have undertaken on her behalf much of the work connected with the estate. While her services with respect to the audit and litigation of the estate's Federal estate tax liability might justify allowance of the extraordinary commissions claimed, there is insufficient evidence in the record for us to make a judgment concerning the full nature and extent of her services. In fact, the estate does not even contend that her services would warrant the award of extraordinary commissions under Ohio law. On the instant record, we hold that the estate is not entitled to deduct $ 12,000 as extraordinary executrix' commissions, since it has not shown that *243 it met the provisions of Ohio law authorizing the award of that type commission. [26]
3. Additions to Tax
Respondent determined that the estate is liable for (1) the addition to tax imposed by section 6651(a)(1) for failure to file timely the estate tax return; (2) the additions to tax imposed by section 6653(a) for an underpayment of tax due to negligence or disregard of rules and regulations; and (3) the addition to tax imposed by section 6660(a) for a valuation understatement. a. Section 6651(a)(1)
Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return. In the instant case, the estate tax return was filed on July 3, 1989, four months and two days after the extended due date of March 1, 1989. The addition to tax does not apply if the failure is due to reasonable cause and not willful neglect. Sec. 6651(a)(1). *244 Respondent does not argue that the late filing of the estate tax return was due to willful neglect. Consequently, we will decide whether the estate has shown that reasonable cause existed for the failure to file timely. In order to show reasonable cause, the estate must show that, despite the exercise of ordinary business care and prudence, it was unable to file the return within the prescribed time. United States v. Boyle, 469 U.S. 241, 246 (1985); Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. On the instant record, we conclude that the estate has not carried its burden of showing that respondent's determination to impose the addition to tax under section 6651(a)(1) is erroneous. The estate tax return was originally due on December 27, 1988. Ms. Phillips, as executrix, applied for and received a three-month extension of the due date until March 1, 1989. Thus, she was aware of the due date of the return. No subsequent extensions were obtained. At trial, Ms. Phillips claimed that Mr. Segedy, her attorney, had informed her that a second extension until June 27, 1989, *245 had been obtained within which to file the return. [27] There is no corroboration for Ms. Phillips' claim. In fact, it is in conflict with other evidence concerning the circumstances regarding the late filing of the return. It is also significant that Alan Segedy, the attorney who represented Ms. Phillips as executrix of the estate, was not called to testify, and no explanation was given for his absence. We may therefore assume that his testimony would have been unfavorable to Ms. Phillips' testimony and to the position of the estate. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. *246 162 F.2d 513 (10th Cir. 1947). It is noteworthy that the dates appearing in the return next to the signatures of Ms. Phillips and Mr. Segedy are February 27, 1989, and February 25, 1989, respectively, both of which fall within the extended filing period granted to the estate. Although Ms. Phillips denies having signed the return on February 27, 1989, neither she nor anyone else has attempted to explain how or why that date appears next to her signature and the date of February 25, 1989, appears next to Mr. Segedy's signature. If we presume, as we ordinarily would, that the dates in the return are the dates on which Ms. Phillips and Mr. Segedy affixed their respective signatures to the return, this would suggest that the return was prepared in a timely manner and would undercut Ms. Phillips' testimony that she was informed by Mr. Segedy that a second extension had been obtained. Indeed, in the August 25 letter from Mr. Segedy to the Service, he asserts that problems in administration of the estate prevented timely filing and makes no mention of a second extension having been obtained by the estate. Thus, Mr. Segedy acknowledged in his August 25 letter *247 that the return was not timely filed. Ms. Phillips offered no explanation as to why Mr. Segedy would, as she apparently is claiming, misrepresent to her that he had obtained a second extension. He certainly could not have expected, and evidently did not intend, to conceal from her the fact that no second extension had been obtained. In fact, he even sent her a copy of the August 25 letter in which he acknowledged that the return had not been filed timely. Under the foregoing circumstances, we are not required to, and do not, accept Ms. Phillips' testimony that she did not sign the return on February 27, 1989, or her claim that Mr. Segedy informed her that a second extension for filing the return had been obtained. Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir. 1972), affg. T.C. Memo. 1970-335; Davis v. Commissioner, 88 T.C. 122, 141 (1987), affd. 866 F.2d 852 (6th Cir. 1989). Based on the entire record, *248 we conclude that the estate has not satisfied its burden of showing that the late filing of the estate tax return was due to reasonable cause. [28] Accordingly, we sustain respondent's determination. b. Section 6653(a)
Section 6653(a)(1)(A) provides that, where any part of an underpayment of tax is attributable to negligence or disregard of rules or regulations, an amount equal to five percent of the underpayment will be added to the tax. Section 6653(a)(1)(B) imposes a further addition to tax in the amount of 50 percent of the interest payable on the portion of an underpayment attributable to negligence or disregard of rules or regulations. Respondent does not argue that the estate's underpayment is attributable to disregard of rules or regulations. Consequently, we will consider only whether the underpayment of estate tax was attributable *249 to negligence. Negligence has been defined as a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Accardo v. Commissioner, 942 F.2d 444, 452 (7th Cir. 1991), affg. 94 T.C. 96 (1990); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The estate's underpayment of tax results from (1) deductions claimed in the return for income taxes due from decedent, which the estate has conceded were excessive in amount, (2) disallowed expense deductions which have been conceded altogether by the estate either in the stipulation or on brief, (3) disallowed expense deductions with respect to the residence which the estate here claims in amounts different from those claimed in the return, but which we have decided are not allowable, (4) the undervaluation in the return of the residence and certain stock owned by decedent, and (5) the omission from the return of income tax refunds due to decedent. Ms. *250 Phillips contends that as executrix she relied on two attorneys, Mr. Segedy and Mr. Feeley, to advise her concerning the estate tax return and that therefore the estate should not be held liable for the additions to tax for negligence. She testified that, while she was not sure of the accuracy of certain items on the return, including the estimates of income taxes due from decedent, she "just signed it and sent it in" based on the advice of those attorneys. Neither attorney testified. We thus assume that their testimony would have been unfavorable to the estate's position with respect to the additions to tax for negligence. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165. Reliance on an adviser, standing alone, is not an absolute defense to the addition to tax for negligence. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.    , 111 S.Ct 2631 (1991); see Allen v. Commissioner,925 F.2d 348, 353-354 (9th Cir. 1991), affg. 92 T.C. 1 (1989). *251 It is but one factor to be considered. Freytag v. Commissioner, supra.A taxpayer cannot avoid the responsibility for filing an accurate return by delegating the task to an agent. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). A taxpayer may be held responsible for any negligence by an agent in preparing a return. American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1117 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958). In order for reliance on a tax preparer to be reasonable, the taxpayer must establish that the correct information was provided to the preparer and that the item incorrectly claimed or reported in the return was the result of the preparer's error. Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Enoch v. Commissioner, 57 T.C. 781, 803 (1972); see Accardo v. Commissioner, supra at 452-453. The taxpayer must also prove that a reasonable *252 person would have relied upon the advice provided. Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir. 1992), affg. per curiam T.C. Memo. 1991-449. We are unable to conclude on the present record (1) that Ms. Phillips provided Mr. Segedy or Mr. Feeley with the correct information relating to the items erroneously claimed in the return, (2) that the errors were the result of Mr. Segedy's or Mr. Feeley's mistakes, or (3) if so, whether or not such mistakes were due to negligence on the part of Mr. Segedy or Mr. Feeley for which the estate would have to bear ultimate responsibility. Enoch v. Commissioner, supra; American Properties, Inc. v. Commissioner, supra. Because we do not know how or why the errors in the return were made, we have no basis on which to conclude that the estate's reliance on its advisers with respect to those matters was reasonable. For instance, the estate concedes that it is entitled to deduct only $ 7,000 as income taxes due from decedent, and not the $ 15,369 estimate of such taxes claimed as a deduction in the return. However, *253 we do not know how that estimate was developed. Although Ms. Phillips testified that she relied on Mr. Segedy to estimate the expenses claimed in the return, which would include the estimate for income taxes due from decedent, she also testified that she did not know where Mr. Segedy obtained the information on which the estimates were based. There is nothing in the record which establishes that Mr. Segedy was familiar with or had some knowledge of decedent's income tax situation or that it was otherwise reasonable to rely on him to estimate the income taxes owed by decedent. Nor do we know what information Mr. Feeley considered before advising Ms. Phillips about the items in the return to which the underpayment is attributable or what he advised her as to those items. It seems that his inspection of the return consisted of a limited review on the day Ms. Phillips claims to have signed it. We have serious reservations as to whether such a limited review would have enabled him to advise her with any reasonable degree of certainty that the return had been properly completed as to income taxes owed by decedent or as to any other item contributing to the underpayment. As for the *254 advice that Ms. Phillips claims she received from Mr. Feeley to the effect that any problems with the return would be sorted out on audit, any such advice would tend to create the appearance of an indifference to the accuracy of the return on Mr. Feeley's part, suggesting a lack of due care by him. The record also is devoid of any explanation as to how or why the other errors in the return were made. For example, it seems that the undervaluation of the residence in the return resulted from reliance on Mr. Kaess' valuation of that property. However, the record does not disclose who decided to use that valuation for Federal estate tax purposes or why it was considered indicative of the residence's fair market value on the date of decedent's death. Based on the entire record, we sustain respondent's determination that the entire underpayment of estate tax was due to negligence. c. Section 6660
Section 6660(a) provides that, where an underpayment of estate or gift tax is attributable to a valuation understatement, there is to be added to the tax an amount equal to the applicable percentage of the underpayment so attributed. [29] This addition to tax does not apply if the value *255 claimed in the return exceeds 66 2/3 percent of the correct value of the property in question or if the underpayment attributable to the valuation understatement is less than $ 1,000. Sec. 6660(c) and (d). Respondent has determined that the addition applies with respect to the undervaluation of the residence. On brief, the estate states that "The addition to tax under section 6660 is dependent upon the Court's determination concerning fair market value of the residence." [30] We have determined the fair market value of the residence as of the date of decedent's death. Consequently, the addition to tax imposed by section 6660(a) will apply to the estate if, after making the Rule 155 computations, the valuation understatement satisfies the threshold requirements of that provision, which clearly appears to be the case. In that event, the amount of the addition to tax will be computed using the appropriate *256 applicable percentage provided by section 6660(b). To reflect the concessions of the parties and the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all seciton references are to the Internal Revenue Code in effect on the date of decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the portion of the underpayment attributable to negligence. Respondent determined that the entire underpayment was attributable to negligence.↩
2. Each party objected to certain stipulations on grounds of relevancy. We address those objections below.↩
3. The sales price was subject to a $ 3,000 credit for the septic system.↩
4. The estate also reserved the right to claim additional expenses in connection with the Rule 155 computation.↩
5. Although sec. 2032 permits taxpayers to elect an alternate valuation date, no such election was made here.↩
6. The estate attempted to have Warren Victor Kaess (Mr. Kaess), who appraised the residence in connection with the Ohio probate proceedings involving the estate (Ohio probate proceedings), testify as an expert on the value of the residence. Although respondent timely submitted the written report of her proffered expert as required by Rule 143(f)(1), the estate did not submit a written report prepared by Mr. Kaess or any other proffered expert. Beginning on April 9, 1993, the Court had a series of telephonic, pretrial conferences with counsel for the parties, in which the Court discussed, among other things, the estate's failure to lodge such a report. On May 3, 1993, seven days before this case was called from the calendar, the estate filed a motion requesting the Court to permit Mr. Kaess to testify as an expert without a written report. The Court denied the estate's motion, having found that the estate had not established good cause for its failure to comply with Rule 143(f)(1) and that respondent might be unduly prejudiced if the motion were granted. Mr. Kaess was allowed to testify as a fact witness.↩
7. The residence consisted of two parcels of land. Each parcel was separately valued for local real property tax purposes (assessed value). The parcel on which there were no improvements was valued at $ 6,600 by the local real property assessor's office. Thus, the total assessed value of the residence at the time of decedent's death was $ 132,400. Consequently, it appears that the value of the residence that was claimed by the estate and that was based on Mr. Kaess' appraisal does not even reflect the full assessed value of that property.↩
8. The estate objected to those stipulations as irrelevant. We find that those stipulations are relevant to the issue of the fair market value of the residence on the date of decedent's death and therefore overrule the estate's objections. Respondent objected to certain stipulations relating to the residence as irrelevant. We find that those stipulations are relevant to the issue of the fair market value of the residence and therefore overrule respondent's objections.↩
9. Respondent has abandoned her position in the notice that the value of the residence was $ 659,000.↩
10. Decedent died on March 27, 1988. The sales of the comparable properties occurred on May 13, 1988, May 31, 1988, and December 16, 1988. Respondent's expert rejected the reproduction cost approach because of the residence's age and the income approach because it is rarely used to value residential property.↩
11. Ms. Phillips did not testify that any repairs to the fireplaces were made after decedent's death. She did not inform Thomas Moser of any defects in the house when he and his wife purchased the residence in July of 1991. Furthermore, the Mosers inspected the house for defects many times before buying it and did not identify any structural defects in it.↩
12. The estate advances other arguments in order to derogate the report of respondent's expert. We have considered each of them and find them to be without merit.↩
13. Respondent's expert explained that she did not realize that there was a swimming pool because she inspected comparable property 3 after a blizzard, and it was not visible. As for her error regarding the garage, respondent's expert testified that the county records she examined were unclear and that she reached her original conclusion about the garage only after she spoke to a local tax appraiser for clarification of the county records. Thereafter, upon inspection of comparable property 3, she determined that it had a four-car attached garage.↩
14. Ms. Phillips recorded her ownership interest in the residence on this date because she was required to do so as a condition to obtaining a line of credit secured by the residence from Central Trust.↩
15. On brief, the estate claims amounts for certain of these expenses that differ from the stipulated amounts. The estate provides no explanation for, or substantiation of, the differences between the amounts claimed on brief and the stipulated amounts. Certain of the amounts claimed on brief by the estate appear on a schedule of expenses prepared by Ms. Phillips prior to trial. Ms. Phillips provided no substantiation of the amounts set forth in that schedule, such as invoices, bills, or canceled checks. We are not required to, and do not, accept such uncorroborated statements. Davis v. Commissioner, 88 T.C. 122, 141 (1987), affd. 866 F.2d 852↩ (6th Cir. 1989).
16. It is not clear whether respondent agrees with that assumption.↩
17. Although it has not so stated, presumably, the estate believes that the doctrine of Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971), applies here.
18. Sec. 20.2053-3(d)(2), Estate Tax Regs., governs the deductibility of the expenses of selling estate property. It provides that selling expenses are deductible only if the sale is necessary to pay the decedent's debts, administration expenses, or taxes, to preserve the estate or to effect distribution.↩
19. Although sec. 20.2053-3(a) and -3(d)(1), and not -3(d)(2), of the regulations are at issue here, sec. 20.2053-3(d)(1), Estate Tax Regs., requires that expenses of preserving property be necessary before a deduction is allowed. We note that the United States Court of Appeals for the Seventh Circuit, the Circuit in which Ms. Phillips resided at the time the petition was filed, has not directly addressed the validity of the regulations at issue in the instant case, although, as we noted in Estate of Posen v. Commissioner, 75 T.C. 355, 366 (1980), it has taken the position that allowability of an expense under State law generally is determinative of deductibility as an administration expense under sec. 2053(a). Estate of Jenner v. Commissioner, 577 F.2d 1100, 1105-1106 (7th Cir. 1978), revg. T.C. Memo. 1977-54. In Estate of Jenner v. Commissioner, supra↩ at 1105 n.12, the Court of Appeals did not decide whether to sustain the requirement of sec. 20.2053-3(a) and -3(d)(2), Estate Tax Regs., that expenses be "necessary" because the Illinois law at issue therein, like those regulations, required expenses to be necessary in order to be allowable.
20. In view of our holding that the estate has failed to establish that the expenses at issue were necessary or otherwise allowable under Ohio law, we need not decide whether the "necessariness" requirements of Ohio law and of the regulations under sec. 2053(a) are the same. However, we note that in certain instances the courts appear to have treated such a requirement under State law as being the same as that requirement under the estate tax regulations. Estate of Jenner v. Commissioner, supra at 1105 n.12 (construing Illinois law); Estate of Carson v. Commissioner, T.C. Memo. 1976-73 (construing Illinois law); see also Estate of Smith v. Commissioner, 510 F.2d 479, 482-483 (2d Cir. 1975), affg. 57 T.C. 650↩ (1972) (construing New York law).
21. Under Ohio law, when real property passes by testate or intestate succession, an executor or administrator is to apply for a certificate of transfer from a Probate Court in Ohio prior to filing the final account for the estate. If this is not done, a devisee or heir may apply for the certificate of transfer. Ohio Rev. Code Ann. sec. 2113.61 (Anderson 1990). The certificate issued by a Probate Court in Ohio is to be recorded on receipt by the county recorder, and the recorder's index of deeds is to show the deceased person as the grantor of the real estate and the devisee or heir as grantee. Ohio Rev. Code Ann. sec. 2113.62 (Anderson 1990). The certificate of transfer does not convey title; it merely serves as a memorialization by a Probate Court in Ohio of what occurs in Ohio with respect to the title to real property that passes at death, viz., title to that property automatically passes to the devisee or heir as of the death of its owner. Platt v. Petrosky, 1992 Ohio App. LEXIS 3953↩. Accordingly, the recording of Ms. Phillips' interest in the residence did not change the fact that, upon admission of decedent's will to probate, title to the residence passed to her effective as of the date of decedent's death.
22. The estate does not contend that the amount allowed by respondent is less than the amount of fees otherwise allowable to an executrix for ordinary services under Ohio Rev. Code Ann. sec. 2113.35↩ (Anderson 1990).
23. Nor apparently has an application for such an order been made. However, it may not be necessary to submit a formal written application for additional allowances in order for a Probate Court in Ohio to award them. In re Estate of Brown, 129 N.E.2d 509 (Ohio Ct. App. 1954↩).
24. Estate of Rabe v. Commissioner, T.C. Memo. 1975-26; Estate of Schildkraut v. Commissioner, T.C. Memo. 1965-239, affd. in part, revd. in part without discussion of this point 368 F.2d 40↩ (2d Cir. 1966).
25. Ohio Rev. Code Ann. sec. 2113.36↩ (Anderson 1990) provides that a Probate Court in Ohio may permit an executor to receive allowances in addition to the commissions otherwise provided by law for "extraordinary services not required of an * * * [executor] in the common course of * * * duty" in an amount it "considers just and reasonable".
26. We therefore do not have to decide whether the other requirements imposed by the estate tax regulations for deductibility of the amount claimed have been satisfied.↩
27. At trial, respondent objected on grounds of hearsay to Ms. Phillips' testimony concerning statements allegedly made to her by Mr. Segedy and Mr. Feeley. Counsel for the estate stated that Ms. Phillips' testimony was not being offered to prove the truth of those statements, but simply to show what she allegedly was told. We admitted the testimony for that limited purpose.↩
28. We therefore do not have occasion to apply the rule of Estate of La Meres v. Commissioner, 98 T.C. 294↩ (1992), relied on by the estate.
29. The applicable percentage varies directly with the size of the undervaluation, ranging from 10 to 30 percent.↩
30. The estate makes no claim that, pursuant to sec. 6660(e), respondent should have waived the addition to tax under sec. 6660(a).↩