Frank C. DAVIS, Jr. and Frank C. Davis, Jr., Executor of the Estate of Grace K. Davis, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 87–1791.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 27, 1988.

Decided Jan. 27, 1989.

Harlan Dodson, III (argued), Paul S. Parker, Nashville, Tenn., for petitioners-appellants.

. William F. Nelson, Chief Counsel, I.R.S., Michael C. Durney, Acting Asst. Atty. Gen., Tax Div., Dept. of Justice, Gary R. Allen, William S. Rose, Jr., Nancy G. Morgan (argued), Washington, D.C., for respondent-appellee.

Before WELLFORD and NELSON, Circuit Judges, and McQUADE, District Judge.*

DAVID A. NELSON, Circuit Judge.

On his federal income tax return for 1975, appellant Frank Davis deducted a loss allegedly realized on a mortgage foreclosure sale. The Commissioner disallowed the deduction on the basis of 26 U.S.C. § 707(b), which provides that no deduction shall be allowed in respect of losses from direct or indirect sales or exchanges of property between commonly controlled partnerships. The Tax Court upheld the disallowance, and Mr. Davis has appealed.

The evidence disclosed that a bank had foreclosed the mortgage it held on an apartment complex owned by a partnership of which Mr. Davis was a general partner. Forty-one days later the bank sold the property to a second partnership of which

---

* The Honorable Richard B. McQuade, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Mr. Davis was also a partner. It is undisputed that both partnerships were controlled by the same people. The issue on appeal is whether there was an indirect sale within the meaning of § 707(b). Believing that the Tax Court's finding on this point was not clearly erroneous, we shall affirm the Tax Court's disallowance of the deduction.

\*     \*     \*

In December of 1973 Frank Davis became a general partner in Brookwood Apartments, a limited partnership organized earlier that year to develop an apartment project. Construction on the project was financed by a $215,000 construction loan from the Third National Bank. The loan was guaranteed by the original general partners, J.R. Coarsey and Gaines Properties, a Tennessee limited partnership, and was secured by a second mortgage on the Brookwood property. (The first mortgage, in the amount of $2.1 million, was held by Metropolitan Insurance Company.)

The project was scheduled to be completed in February of 1974. An unusually wet spring slowed the work, however, and because construction fell behind schedule, the limited partners withheld scheduled capital contributions. To avoid foreclosure, Mr. Davis signed and guaranteed a note increasing the amount of the construction loan to $675,000.

Construction delays continued into the early months of 1975, and the status of the project became the focus of continuing discussions between the Brookwood general partners and Third National Bank. As guarantor of the construction loan, Mr. Coarsey joined Mr. Davis and Gaines Properties' general partner Lewis Gaines in the negotiations with the bank. Evidence of these negotiations appeared in a series of bank minutes and memoranda.

On July 7, 1975, the bank's finance committee agreed to a repayment schedule and agreed not to foreclose unless the first mortgage holder foreclosed or the limited partners failed to make scheduled principal payments. The finance committee also proposed that the limited partners, along with the general partners, pledge additional collateral to secure the loan fully.

In a memorandum dated August 11, 1975, bank officers Charles W. Cook, Jr., and Don Lockmiller indicated that the plan "approved by the Finance Committee on July 7, 1975, has not been consummated, and it now appears it probably will not be consummated." The memorandum proposed a new plan to "eliminate the problems we have all had in dealing with the limited partners in New York who have been the cause for the plan not working." The new plan, which called for a foreclosure sale August 15, 1975, was outlined as follows:

"We propose to bid the property in at $350,000 based on a letter we will be furnished from Dick Freeman establishing this to be a fair market value (the attorneys for Davis, Gaines and Coarsey feel we should bid it in at a fair market value to avoid any lawsuit the limited partners may bring against us or Davis, Gaines and Coarsey for collusion). This will establish a deficiency against our guarantors of $325,000. We will then lend Davis, Gaines and Coarsey $850,000 secured by satisfactory first mortgages to be furnished us by them (Mr. Coarsey has indicated a willingness to give us a mortgage on the Coarsey Center, a strip shopping center in Madison which is worth at least $750,000, and Frank Davis has agreed to give a first on a farm of 225 acres in the northern part of the County). Proceeds of the loan will be used to buy the apartment project from us, pay off the $325,000 deficiency, pay approximately $100,000 in subcontractor bills which the partners feel obligated to pay and provide $50,000 operating capital while the project achieves its rent-up. All cash flow from the project will be assigned to us and the project will be managed by a professional real estate management company; however, cash flow will probably not allow much principal payment in the first year or two. For this reason, I think we should carry the loan at 8½% as we agreed to do in our previous plan with an understanding that the entire balance would come due

in five years but with the further understanding that the property be placed on the market as soon as all parties agree conditions are favorable for selling the project."

The finance committee met that same day and approved the proposed plan.

In the meantime, Mr. Davis and Mr. Gaines continued discussions with the limited partners in an attempt to buy them out. On the morning of August 15 Mr. Davis received a telephone call informing him that the limited partners had accepted the general partners' offer. On the way to the foreclosure sale Mr. Davis received a telegram from the limited partners confirming their agreement to be bought out. When Mr. Davis arrived at the site of the sale he told Mr. Cook of the changed circumstances and tried to get the sale postponed. Mr. Cook refused, telling Mr. Davis "real quick that they were going to take the best deal, the first deal, and the best deal they could to sell that piece of property." The foreclosure sale went forward as scheduled, with the bank bidding in the property for $200,000.

A subsequent memorandum by Messrs. Cook and Lockmiller reported that "the sale has not been recorded pending the outcome of the proposed plan. The Trust Department of Third National Bank has taken over the day to day management of the complex until such time as we can consummate the sale of the project." The memo described "the proposed plan" in these terms:

"In a discussion with Mr. J.R. Coarsey, Frank Davis, and Lewis Gaines and their respective attorneys on August 26th, we discussed the following plan as a solution to their present problem with Brookwood Apartments. We propose to lend Davis, Gaines and Coarsey $885,000. At the time we do this, Davis and Gaines will put $140,000 cash in a Certificate of Deposit assigned as collateral. Out of the $885,000, they will first pay off our note of $675,000. Out of the balance, $160,000 will go to pay off the remaining debts outstanding against the project and $50,000 will be used as operating capital for the project until such time as they have sufficient cash flow to service all debts from rent-ups. For security on the loan of $885,000, we will have the following:

1. $140,000 Certificate of Deposit

2. First mortgage on a 225 acre farm owned by Frank Davis, valued at $200,000.

3. First mortgage on several pieces of commercial real estate owned by J.R. Coarsey, valued at $200,000.

4. Second mortgage on the Brookwood Apartments.

5. The personal guaranties of Davis, Gaines, and Coarsey.

All cash flow from the project will be assigned to Third National Bank. We would agree to handle this loan for a period of one year at 8¾%. Under this plan, the general partners and also Mr. Coarsey would agree to place the property on the market for sale as soon as possible, with the understanding that we would be paid in full on our loan within the twelve month period. We have checked the Courthouse records and find that practically all of J.R. Coarsey's assets have been in his wife's name since the early 1960's. The collateral he is offering is all he has in his own name."

The finance committee approved this plan on September 2.

On September 26, 1975, a Tennessee limited partnership named C, D & G was established. The participants in C, D & G were the same persons who owned Brookwood Apartments immediately prior to the foreclosure: Mr. Coarsey, Mr. Davis, and Mr. Gaines. Third National Bank transferred its interest in the Brookwood property to C, D & G for $200,000 on the day the partnership was formed.

On his income tax return for 1975 Mr. Davis claimed an ordinary loss of $264,976 on the foreclosure sale of the Brookwood property. The Commissioner disallowed the claimed loss and further determined that Mr. Davis must include in his income for 1974 salaries and interest in the amount of $46,522. This sum had been deducted by the Brookwood partnership on its 1974

return. The Tax Court upheld the Commissioner's rulings, and Mr. Davis appealed to this court.

Section 707(b)(1)(B) of the Internal Revenue Code provides that "no deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between ... two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests." In construing this statute, the Tax Court referred to a line of cases interpreting I.R.C. § 267, a statute the purpose of which is similar to that of § 707(b)(1). Section 267 provides—as did its predecessor, § 24(b) of the Internal Revenue Code of 1939—that "[n]o deduction shall be allowed in respect of any loss from the sale or exchange of property ..., directly or indirectly," between certain related taxpayers.

The Tax Court has held uniformly that § 267 bars the allowance of losses incurred in sales or transfers directly or indirectly between taxpayers having an identity of economic interests. See, *e.g., Hassen v. Commissioner,* 63 T.C. 175 (1974), *aff'd,* 599 F.2d 305 (9th Cir.1979) (resale after foreclosure pursuant to antecedent oral understanding constitutes indirect sale within meaning of § 267(a)(1)); *Zacek v. Commissioner,* 8 T.C. 1056 (1947) (purchase by related taxpayers at foreclosure sale is within terms of § 24(b)(1)(A)); *Blum v. Commissioner,* 5 T.C. 702 (1945) (§ 24(b)(1)(A) precludes deduction of loss from bona fide arm's length sale of partnership interest between brothers).

The Seventh and Fourth Circuits have held that section 24(b) did not apply to involuntary sales or transfers under certain circumstances, while the Fifth and Ninth Circuits have more recently applied § 267 to involuntary sales. *McCarty v. Cripe,* 201 F.2d 679 (7th Cir.1955); *McNeill v. Commissioner,* 251 F.2d 863 (4th Cir.), *cert. denied,* 358 U.S. 825, 79 S.Ct. 43, 3 L.Ed.2d 65 (1958); *Merritt v. Commissioner,* 400 F.2d 417 (5th Cir.1968); *Hassen v. Commissioner,* 599 F.2d 305 (9th Cir.1979).

In *McCarty v. Cripe,* 201 F.2d 679 (7th Cir.1955), property seized by a county was sold at a public auction to a party related to the prior owner. The Seventh Circuit called attention to the Supreme Court's statement in *McWilliams v. Commissioner,* 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750 (1947), " 'that the purpose of § 24(a) was to put an end to the right of *taxpayers to choose,* by intra-family and other designated devices, *their own time* for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.' " *McCarty,* 201 F.2d at 682 (emphasis supplied by Seventh Circuit). The court then found ample evidence in support of its conclusion that § 24(b) ought not to apply:

> "The property was taken from [the taxpayer] by operation of law. He was without choice as to the time when the state would proceed against the property and, consequently, could not have selected the time for the realization of a taxable loss.... Neither is there the slightest indication of any prearrangement between the [taxpayer] and his corporation or anybody else. The property was purchased at a public sale where the bidding was spirited, and there is a strong presumption that it sold for not less than its fair value."

*Id.* The court therefore concluded that the judicial tax sale of the land was not within the purview of § 24(b).

In *McNeill v. Commissioner,* 251 F.2d 863 (4th Cir.1958), property had been seized because of nonpayment of taxes. For six years the tax authorities attempted to sell the land for an amount equal to the unpaid taxes. After failing in their attempts, the tax authorities sold the property to a corporation owned by the taxpayer and his family. The taxpayer then claimed a loss, which the Commissioner disallowed on the basis of § 24(b)(1)(B). The Tax Court upheld the Commissioner's ruling. The Fourth Circuit reversed the Tax Court's decision, concluding that the loss was not brought about by the transfer of the property between related persons, but by the seizure and sale of the property for taxes:

"Of course, the true nature of the transfer rather than the form which is [sic] took is controlling, but there is nothing in the evidence to warrant the inference that McNeill controlled the Pennsylvania authorities so that in effect the seizure and sale for taxes were his actions and not theirs, or that their subsequent attempts to sell the land were not genuine efforts to satisfy the tax lien, or that their final offer to sell the property to the taxpayer was made in collusion with him to serve his purposes.... It is quite impossible to find in this evidence the sort of conduct which characterizes family transfers made for the purpose of realizing tax losses and at the same time retaining the investments."

*Id.* at 865–66.

In *Merritt v. Commissioner*, 400 F.2d 417 (5th Cir.1968), the Fifth Circuit affirmed a decision of the Tax Court applying § 267 to an involuntary sale of stock in a closely held corporation to the taxpayer's wife. The Internal Revenue Service had seized the husband's shares in order to satisfy his tax liability. The shares were sold at public auction to the taxpayer's wife, who was the only bidder. The Fifth Circuit assumed that the transaction "was an *involuntary sale* from which the appellants gained no benefit other than the extinction of the tax liability." *Id.* at 419 (emphasis in original). The court thought that "[i]n order to affirm the Tax Court's decision, therefore, we must conclude that Congress sought to deny the privilege of deducting the loss in all intra-family transactions, not only those where the taxpayer has actively attempted tax-avoidance." *Id.* Noting the "broad sweep" of the statute, the Fifth Circuit concluded that this was indeed the intent of Congress:

"We do not read Section 267 as seeking out devils alone.... This blanket approach relieves the taxing authorities of many complicated and complex melioristic decisions in family transactions. Though we do not applaud harsh results ..., we recognize that simplicity can be a valid congressional rationale for banning transactions by type."

*Id.* at 421.

The Ninth Circuit too has held that § 267 applies to indirect involuntary sales. In *Hassen v. Commissioner*, 599 F.2d 305 (9th Cir.1979), a mortgagee made a non-binding promise to purchase the taxpayers' property at a foreclosure sale and sell it to a corporation owned by the taxpayers. *Id.* at 308. The taxpayers argued that § 267 did not apply because their interest in the property had been interrupted by the foreclosure. The Ninth Circuit rejected this argument, saying

"neither the language itself nor the legislative history suggests that all the stages of the indirect route from taxpayer back to taxpayer's corporation or family member had to be under a binding commitment. If [the mortgagee] had not sold to U.L.C., none of this would be at issue. But it did in fact sell and U.L.C. is owned by the taxpayers.... The mechanics of the transaction should not divert attention from the fact that taxpayers have not sustained any genuine loss in the asset."

*Id.*

In the case at bar the parties disagree as to whether prior to the foreclosure Third National Bank and the Brookwood partnership's principals agreed to the resale of the property to Messrs. Davis, Gaines, and Coarsey. Mr. Davis testified that no such agreement had been reached. Internal bank documents introduced into evidence at trial also suggest that a final agreement was not reached until sometime after the foreclosure sale, and the terms proposed on September 2 differed significantly from those proposed prior to the foreclosure. On August 11 the bank's finance committee authorized the lending of $850,000 at 8½ percent for a term of five years. On September 2 the finance committee approved an $885,000 loan at 8¾ percent for a period of one year. On these facts it could reasonably be concluded that there was no binding agreement at the time of the foreclosure.

■ The Tax Court, however, found that an agreement had been reached prior to the foreclosure sale, and we are not free to reject this finding unless we can say with definite and firm conviction that a mistake has been committed. See *Neher v. Commissioner*, 852 F.2d 848, 851 (6th Cir.1988) (findings of fact by Tax Court are subject to "clearly erroneous" standard of review).

We cannot say that the Tax Court was clearly wrong. The August 11 memorandum provides a basis for inferring that an agreement in principle had been reached. In explaining why the bank would bid in the property at $350,000, the memorandum said "the attorneys for Davis, Gaines and Coarsey feel we should bid it in at a fair market value to avoid any lawsuit the limited partners may bring against us or Davis, Gaines and Coarsey for collusion." This could indicate that bank officials were acting in concert with Mr. Davis and his partners in planning the foreclosure. The foreclosure sale was to be held, indeed, not because of the insolvency of the partnership's general partners, but to "eliminate the problems we have all had in dealing with the limited partners in New York who have been the cause for the plan not working."

The August 11 memorandum contains other indicia of an agreement. According to the document, "Mr. Coarsey has indicated a willingness to give us a mortgage on the Coarsey Center, a strip shopping center in Madison which is worth at least $750,000, and Frank Davis has agreed to give a first on a farm of 225 acres in the northern part of the County." The memorandum also said that after foreclosure the bank "will then lend Davis, Gaines and Coarsey $850,000 secured by satisfactory first mortgages.... Proceeds of the loan will be used to buy the apartment project from us...."

■ Even if an agreement to acquire the property and resell it to the Brookwood general partners was reached prior to August 15, Mr. Davis argues that the agreement ended when the general partners learned that the limited partners had agreed to be bought out. Mr. Davis testified that he sought to abort the foreclosure and was rebuffed by Mr. Cook. The Tax Court rejected this account, describing it as "self-serving testimony of an interested witness." We are not free to substitute our judgment of witness credibility for that of the Tax Court, and "[t]he Tax Court is not required to accept uncontroverted testimony at face value when it is 'improbable, unreasonable or questionable.'" *Estate of DeNiro v. Commissioner*, 795 F.2d 582, 584 (6th Cir.1986).

■ An agreed foreclosure sale followed by an agreed sale back to the mortgagor comes within I.R.C. § 707(b)(1)(B), we believe. This conclusion is consistent with the construction given § 267 by other courts of appeals.

Here, as in *Hassen*, there must be deemed to have been "a prearrangement for repurchase." See *Hassen*, 599 F.2d at 309. The fact that the property foreclosed upon in *Hassen* was owned by the mortgagee prior to its resale to the taxpayer's corporation did not prevent the Ninth Circuit from holding that § 267 applied:

"The statute simply provides that loss from 'indirect sales' cannot be deducted. Neither the language itself nor the legislative history suggests that all the stages of the indirect route from taxpayer back to taxpayer's corporation ... had to be under a binding commitment."

*Hassen*, 599 F.2d at 308.

In *Merritt* the Fifth Circuit held that § 267 applies to foreclosure sales even if the sales are involuntary. 400 F.2d at 420. The court noted that there was no presumption that the shares were sold for their fair value where the taxpayer's wife was the sole bidder. *Id.* at 421. The court expressed no surprise that "the sale of 20% common stock ownership in a closely-held corporation did not excite public bidding." *Id.* In the case at bar, similarly, the evidence strongly suggests that the Brookwood property was sold for less than its fair value. The bank recognized from the outset that the foreclosure sale would not "excite public bidding." Before the limited partners agreed to be bought out, the bank proposed to buy the property for $350,000 in order to avoid a lawsuit—but after the

limited partners were out of the picture, the bank purchased the property for $200,-000.

These circumstances also provide a basis for distinguishing *McCarty, supra,* 201 F.2d 679. The *McCarty* property "was purchased at a public sale where the bidding was spirited, and there [was] a strong presumption that it sold for not less than its fair value." *Id.* at 682. Moreover, in *McCarty* there was not "the slightest indication of any 'prearrangement' between the [taxpayer] and his corporation or anybody else." *Id.*

*McNeill, supra,* 251 F.2d 863, also differs substantially in its facts. In *McNeill*

"there [was] nothing in the evidence to warrant the inference that McNeill controlled the Pennsylvania authorities so that in effect the seizure and sale for taxes were his actions and not theirs ... or that their final offer to sell the property to the taxpayer was made in collusion with him to serve his purposes."

*Id.* at 865–66. In addition, "[i]t [was] quite impossible to find ... the sort of conduct which characterizes family transfers made for the purpose of realizing tax losses and at the same time retaining the investments." *Id.* at 866.

In the case at bar, by contrast, the foreclosure and resale to C, D & G resulted from the cooperation of Third National Bank with Messrs. Davis, Gaines, and Coarsey. I.R.C. § 707(b)(1)(B) proscribes the deduction of losses from foreclosure sales where the property is merely shuffled between commonly controlled partnerships pursuant to an antecedent agreement.

▪ Mr. Davis also argues that the Tax Court erred in upholding the Commissioner's finding that Mr. Davis failed to prove that he did not receive certain salary and interest payments from the Brookwood partnership. "As a general principle, the burden is on the taxpayer to prove the incorrectness of the Commissioner's determinations." *Estate of DeNiro,* 795 F.2d at 584. Specifically, the burden of proof with respect to a bad debt deduction is on the taxpayer. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Mr. Davis had the burden of proving: (1) a valid debtor-creditor relationship, (2) a debt created or acquired in connection with a trade or business, (3) the amount of the debt, (4) the worthlessness of the debt, and (5) the year in which the debt became worthless. I.R.C. § 166. See also 26 C.F.R. § 1.166–1.

▪ Although Mr. Davis was the keeper of the partnership's books, he did not produce them. Instead, he relied on his own self-serving testimony to show nonpayment of the monies due him. The Tax Court was not required to accept this testimony as correct. In addition, Mr. Davis failed to show that the alleged debt became worthless in 1975. Some partnership debts were paid in 1975, and, as the Tax Court observed, a good faith effort to collect a debt is an element to be considered in determining its worthlessness. Finally, upon termination of the original partnership in August of 1975, the general partners remained liable for the partnership's debts. Mr. Davis did not show that he tried to collect the debt from the general partners or that they were unable to pay it. The Tax Court therefore did not err in upholding the Commissioner's disallowance of the bad debt deduction.

The decision of the Tax Court is AFFIRMED.