ROBERT J. THIBAULT AND PATRICIA THIBAULT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thibault v. Commissioner
Docket Nos. 2353-93, 20388-93
United States Tax Court
T.C. Memo 1994-482; 1994 Tax Ct. Memo LEXIS 490; 68 T.C.M. (CCH) 831; October 4, 1994, Filed *490 Decisions will be entered for respondent. For petitioners: Joseph Falcone. For respondent: Lenora R. Roland. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined deficiencies in petitioners' Federal income tax for 1989, 1990, and 1991 in the amounts of $ 4,363, $ 5,696, and $ 4,139, respectively. The issue remaining for decision is whether petitioner Robert J. Thibault conducted his charter boat fishing activity during the years at issue with the objective of making a profit within the meaning of section 183. [1] We hold that he did not. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Robert J. Thibault (Mr. Thibault or petitioner) and Patricia Thibault (Ms. Thibault) resided in Clio, Michigan, at the time the petitions were filed. Mr. Thibault is a real estate investor. *491 He buys property and then sells it on land contract agreements or through seller-financed mortgages. During the years at issue, petitioner maintained a minimum of 23 properties. Starting in about 1938 and for about 20 years thereafter, Mr. Thibault operated a tree surgery company known as Eastside Tree Surgery (Eastside Tree). Eastside Tree was involved primarily in the removal of dead elm trees throughout the State of Michigan, although the majority of its work was concentrated in Detroit, Michigan. Eastside Tree, which at one time employed as many as 52 persons, was a profitable business for petitioner. When elm tree removal work began to decline, Mr. Thibault sold Eastside Tree and entered the demolition business. From 1958 to 1985, Mr. Thibault operated a company known as Thebo & Son Demolition (T&S Demolition) which was involved in the demolition of commercial and residential structures throughout the State of Michigan. That company, which employed approximately 16 persons, was a profitable business for petitioner. T&S Demolition ceased operating when demolition work began to decline. Petitioner fished for pleasure for many years prior to 1988. During the early 1980's, *492 Mr. Thibault had a few conversations with Thomas Rasmussen (Mr. Rasmussen), a charter boat operator who as of the time of the trial herein had been operating a charter boat fishing service for about 15 years out of Manistee, Michigan, on Lake Michigan. Those conversations covered general and basic questions relating to charter boat fishing and starting a charter boat fishing service. On April 30, 1986, petitioner submitted to the Department of Natural Resources of the State of Michigan (DNR) a registration and application for inspection (registration and application form) to use his 27-foot boat, named Hooker 1, to carry six passengers for hire. That was the first time petitioner submitted such a form to the DNR. In the registration and application form petitioner submitted for Hooker 1, he listed Ludington, Michigan, on Lake Michigan, as the home port of that vessel and indicated that Hooker 1 was to carry paying passengers to fishing locations in Lake Michigan that were located within five miles of shore. At the end of 1987, petitioner prepared an analysis of gross receipts only, and not costs, for a charter boat fishing service that reflected the following: Assumptions: *493 1. 6 people (Fisherman) [sic] capacity (not including crew) 2. $ 70 per person for [one-]half day 3. Average 4 days a week available because of weather 4. Season lasts from May 1 through October 1 Gross Receipts Calculation:
22 weeks X 4 days per week X $ 420 (a capacity full charter) X 2 trips per day = $ 73,920 potential gross income
On February 6, 1988, Mr. Thibault purchased for $ 113,775 a 1987 34-foot Bayliner boat, named Blue Diamond. As part of that purchase, petitioner traded in Hooker 1 and received a credit of $ 28,775 toward the purchase price of Blue Diamond. Petitioner financed personally, and not as a business, the remaining $ 85,000 of the purchase price of Blue Diamond. On May 17, 1988, Mr. Thibault purchased for $ 21,000 a docking slip for Blue Diamond. In the 1994 edition of the ABOS Marine Blue Book, a book that provides a complete reference of dealer prices, loan values, comparable specifications, and wholesale prices of boats, a vessel of the same size, make, and model year as Blue Diamond is listed as having an estimated average trade-in value (less repairs) of betwen $ 52,782 and $ 61,062. Petitioner *494 obtained two binders for insurance on Blue Diamond. The first binder, which stated that the coverage included a "charter fishing endorsement", covered the period February 22, 1988, through February 22, 1990, and provided for hull damage protection up to $ 85,000 (subject to an $ 850 deductible), for liability protection up to $ 300,000, and for medical payment protection up to $ 1,000. The second binder, which also stated that the coverage included a "charter endorsement", covered the period February 22, 1990, through February 22, 1991, and provided for hull damage protection up to $ 85,000 (subject to an $ 850 deductible) and for liability protection up to $ 300,000. On March 7, 1988, petitioner submitted to the DNR a registration and application form to use Blue Diamond to carry passengers for hire. In that form, petitioner listed Oscoda, Michigan, on Lake Huron as the home port of Blue Diamond and indicated that Blue Diamond was to carry six paying passengers to fishing locations in that lake. Petitioner received three certificates of inspection from the Law Enforcement Division of the DNR, each of which was valid for a one-year period that expired on May 31, *495 1990, May 31, 1991, and May 31, 1992, respectively, and which authorized him to use Blue Diamond to carry six passengers for hire on the waters of the State of Michigan. On January 5, 1989, the DNR issued petitioner a sport trolling license authorizing him to use that vessel for sport trolling. During 1988, Mr. Thibault started operating a charter boat fishing service under the name Blue Water Charter Service (Blue Water Charter). He was still operating that service as of the date of the trial of these cases. Petitioner intended to operate Blue Water Charter to fish for various species, including lake trout, steelhead or rainbow trout (rainbow trout), chinook salmon, cobalt, and walleye, during the six-month fishing season on the Great Lakes which runs from late April or early May through October. Mr. Thibault did not maintain a separate business bank account for Blue Water Charter. The telephone number listed for Blue Water Charter was that of petitioners' personal, summer residence in Oscoda, Michigan. Although petitioner advertised in newspapers when he first started Blue Water Charter, he subsequently decided to rely on the use of fliers and business cards in order *496 to advertise his charter boat fishing service. Mr. Thibault was not a member of the Michigan Charter Boat Captains Association and did not advertise in a monthly magazine published by that association. Mr. Thibault sometimes took Blue Diamond into Lake Huron the night before a morning charter to determine the best location in which to fish. As part of the charter service of Blue Water Charter, petitioner supplied customers with all necessary fishing gear. He also hired someone who assisted him and the charter customers and who usually received compensation solely in the form of tips from those customers. Mr. Thibault signed a letter dated October 23, 1989 (October 1989 letter) that was addressed "To Whom This May Concern" and that stated: The fishing was very poor out of Oscoda this year that [sic] we cancelled our charter & ceased fishing effective July 31, 1989.
The DNR requires all charter fishing boat operations in the State of Michigan to complete a monthly report (monthly catch report) documenting the date and number of hours of fishing and the number of fish of various species that have been caught. In a letter dated September 14, 1990, the DNR advised petitioner *497 that it had not received from him the required monthly catch reports for May, June, and July 1990. Mr. Thibault responded to that letter by explaining his failure to submit those required reports as follows: "This operation is not chartering fishing parties for the 1990 fishing season, but may be chartering in 1991." Mr. Thibault indicated in a monthly catch report for April 1991 that no fish had been caught during that month. At no time pertinent to these cases has petitioner, who reported losses for each of the years 1989 through 1992 from his operation of Blue Water Charter, considered using or used a charter or booking agent in order to attract customers to Blue Water Charter. Nor has he (1) considered entering or entered into any agreements with other charter boat operators to service the overflow clientele, if any, of those operators, (2) contemplated changing or changed his port of operation, or (3) considered using or used Blue Diamond for cruises or sightseeing charters. Petitioners filed joint Federal income tax returns for each of the years at issue. In their 1989 return, petitioners reported on line 23 total income of $ 42,264. That total income figure was based, *498 inter alia, on the following items of income and loss: (1) Interest income of $ 61,154 (reflected in Schedule B (Interest and Dividend Income)), (2) net rental income of $ 1,552 (reflected in Schedule E (Supplemental Income and Loss)), and (3) a loss of $ 24,974 from Blue Water Charter (reflected in Schedule C (Profit or Loss from Business)). The $ 24,974 loss was based on reported gross receipts of $ 5,780 and reported deductions of $ 30,754, comprised of $ 21,297 in depreciation, $ 1,286 in insurance, $ 6,492 in interest, $ 75 in equipment rental, $ 316 in repairs, $ 227 in supplies, $ 965 in fuel, and $ 96 in marina dues. In their joint Federal income tax return for 1990, petitioners reported on line 23 total income of $ 49,794. That total income figure was based, inter alia, on the following items of income and loss: (1) Interest income of $ 65,230 (reflected in Schedule B), (2) a loss of $ 1,565 from rental property (reflected in Schedule E), and (3) a loss of $ 24,580 from Blue Water Charter (reflected in Schedule C). The $ 24,580 loss was based on reported gross receipts of $ 6,782 and reported deductions of $ 31,362, comprised of $ 17,035 in depreciation, $ 1,296 in insurance, *499 $ 8,386 in interest, $ 325 in legal services, $ 2,069 in repairs, $ 1,066 in supplies, $ 1,050 in fuel, and $ 135 in marina dues. In their joint Federal income tax return for 1991, petitioners reported on line 23 total income of $ 63,034. That total income figure was based, inter alia, on the following items of income and loss: (1) Interest income of $ 58,747 (reflected in Schedule B), (2) net rental income of $ 6,582 (reflected in Schedule E), and (3) a loss of $ 16,646 from Blue Water Charter (reflected in Schedule C). The $ 16,646 loss was based on reported gross receipts of $ 8,621 and reported deductions of $ 25,267, comprised of $ 13,682 in depreciation, $ 1,123 in insurance, $ 7,047 in interest, $ 1,321 in repairs, $ 820 in supplies, $ 1,139 in fuel, and $ 135 in marina dues. OPINION Section 183 -- In General
Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to that activity is allowed except as provided in section 183(b). Section 183(b)(1) allows certain deductions without regard to whether or not an activity is engaged in for profit. Section 183(b)(2) further allows certain other deductions, but only to the *500 extent of the gross income derived from the activity. Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or section 212. In determining whether an activity is engaged in for profit, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit. E.g., Hulter v. Commissioner,91 T.C. 371, 392 (1988); Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation need not be reasonable, but he or she must have a good faith objective of making a profit. E.g., Dreicer v. Commissioner, supra;sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proving the requisite intent. E.g., Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner,59 T.C. 791, 813 (1973), *501 affd. 495 F.2d 1079 (6th Cir. 1974). The determination of whether an activity is engaged in for profit is to made by reference to all the facts and circumstances. E.g., Hulter v. Commissioner, supra at 393; Taube v. Commissioner,88 T.C. 464, 480 (1987); sec. 1.183-2(a) and (b), Income Tax Regs. We give greater weight to objective facts than to a taxpayer's mere statement of intent. E.g., Dreicer v. Commissioner, supra;sec. 1.183-2(a), Income Tax Regs.
In determining whether an activity is engaged in for profit, section 1.183-2(b), Income Tax Regs., lists the following nine factors that normally are to be taken into account: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount *502 of occasional profit, if any, that is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. The list is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g., Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective is not based on a mere counting of the number of factors that support each party's position. E.g., Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.
Burden of Proof
Petitioners bear the burden of proving that the determinations made by respondent in the notices of deficiency are erroneous. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). They have attempted to satisfy their burden through documentary and testimonial evidence. We find both the documents on which petitioners rely and the testimony of Mr. Thibault to be in large *503 part unreliable and/or suspect. As for the documentary evidence, we note that certain documents in the record contradict other documents in the record and/or petitioner's testimony. As for the testimony of Mr. Thibault, we note that his testimony was at times inconsistent. In addition, having had the opportunity to observe his demeanor, we did not find his testimony to be credible in certain material respects. Thus, we are not required to, and do not, accept or rely on the self-serving testimony of Mr. Thibault in resolving the issue in these cases. See Davis v. Commissioner,866 F.2d 852, 859 (6th Cir. 1989), affg. 88 T.C. 122 (1987); Tokarski v. Commissioner,87 T.C. 74, 77 (1986). In an attempt to corroborate Mr. Thibault's testimony, petitioners offered the testimony of Mr. Rasmussen who operated a charter boat fishing service out of Manistee, Michigan. They did not offer the testimony of Ms. Thibault or of any individual who petitioner claimed assisted him in operating Blue Diamond and Blue Water Charter during the years at issue, such as the crewperson and the bookkeeper about *504 whom petitioner testified. Nor did petitioners explain why that testimony was not offered. We thus assume that it would not have been favorable to petitioners' position herein. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Facts and Circumstances Relating to Mr. Thibault's Charter Boat Fishing Activity
Petitioners contend that, taking account of the factors listed in section 1.183-2(b), Income Tax Regs., they have established that Mr. Thibault operated Blue Water Charter during each of the years at issue with an actual and honest objective of making a profit. Respondent disagrees. Based on our consideration of the entire record, we are in agreement with respondent and find that petitioners failed to show that Mr. Thibault was engaged in his charter boat fishing activity during the years at issue with the objective of making a profit within the meaning of section 183. Mr. Thibault reported losses for each of the years at issue from his operation of Blue Water Charter. He testified that he also had a loss for 1992 and that he may have had a loss *505 for 1993, although he was not certain. In an apparent effort to explain those losses, petitioners point to (1) the depreciation and interest deductions Mr. Thibault claimed as a result of his purchase of Blue Diamond and (2) an unforeseen decline in the fisheries of the Great Lakes beginning around mid-1988 or 1989 that adversely affected the charter boat fishing industry of those lakes. With respect to the impact of the depreciation and interest deductions that Mr. Thibault claimed on the profitability of his charter operation, it is undisputed that those deductions contributed to the losses he reported from that activity. However, petitioners failed to show that, in an attempt to reduce the effect of those deductions on the profitability of Blue Water Charter, Mr. Thibault undertook, or even explored, different activities or operational methods to enhance the ability of that operation to generate greater revenue or to reduce other expenses. With respect to the alleged decline in the fisheries of the Great Lakes, petitioners introduced into evidence a series of articles from newspapers and magazines. Although those articles, which are general in nature, describe a decline *506 in some species of fish and the charter boat fishing industry of the Great Lakes, they also describe stable or increasing populations of other fish species. Respondent included in the record certain informational tables prepared by the DNR for the Oscoda area reflecting numbers of fish of certain species caught, angler hours, angler trips, and charter excursions for the period from April through October of each of the years 1987 through 1991. Although those tables indicate that both decreases and increases occurred during the years at issue in the various categories of items reported, we are unsure from our review of those tables of, inter alia, (1) the scope or type of fishing on which the information in them is based, (2) the source of the information underlying the tallies reflected in them, and (3) the manner in which that underlying information was compiled. We therefore are reluctant to, and will not, rely on the articles offered by petitioners and the DNR informational tables offered by respondent in determining whether there was an actual decline in fisheries and the charter boat fishing industry of the Great Lakes during any of the years at issue. Even assuming arguendo *507 that the losses generated by Blue Water Charter are to some extent attributable to an unforeseen decline in the fisheries and the charter boat fishing industry of the Great Lakes beginning around mid-1988 or 1989, it is noteworthy that petitioners in fact reported an annual increase in the gross receipts from Mr. Thibault's charter boat fishing service for each of the years 1989, 1990, and 1991, the years at issue. [2] Thus, any such decline evidently did not adversely affect his operation during those years. More importantly, petitioners have not demonstrated that Mr. Thibault attempted to overcome the results of any such decline by implementing, or even considering, steps to enhance the ability of Blue Water Charter to generate greater revenue or to cut costs associated with that charter operation. In particular, petitioner did not consider or implement any of the following options: *508 (1) Changing his port of operation, (2) using a charter or booking agent in order to attract customers to Blue Water Charter, (3) entering into any agreements with other charter boat operators to service the overflow clientele, if any, of those operators, or (4) using Blue Diamond for cruises or sightseeing charters. [3] Petitioner's general and conclusory explanation for failing to consider or implement any of those options was that he did not believe that they would be effective. He did not specify why he held that belief. On the instant record, we are not persuaded that, had petitioner in fact intended to operate Blue Water Charter with a profit objective, he would not have implemented, or at least seriously explored, at least some, if not all, of those options in an attempt to increase the profitability of Blue Water Charter. *509 In further support of their position that Mr. Thibault operated Blue Water Charter with an actual and honest objective of making a profit, petitioners assert that Mr. Thibault maintained adequate books and records for Blue Water Charter. The only record relating to Blue Water Charter in evidence is a log that the parties stipulated petitioner prepared for his charter operation for the year 1989 (the stipulated log). [4] That log indicates (1) that, after July 31, 1989, and through September 4, 1989, Blue Diamond was chartered for nine days, three of which involved half-day charters and (2) that, as a result of 24 charters of Blue Diamond occurring from May 20, 1989, through September 4, 1989, Blue Water Charter generated $ 5,830 in gross receipts. *510 It is unclear from the record whether the stipulated log was prepared contemporaneously with the occurrence of the events reflected therein or was prepared at a later date. It is significant that, to the extent that log reflects charters of Blue Diamond occurring after July 31, 1989, it is contradicted by the statement in the October 1989 letter signed by Mr. Thibault that charters of that vessel "ceased * * * effective July 31, 1989." [5] It is also noteworthy that the stipulated log is further contradicted by the Schedule C attached to petitioners' 1989 return, which shows that Blue Water Charter generated $ 5,780 in gross receipts during 1989. The stipulated log, however, indicates that $ 5,830 in gross receipts was generated during that year. *511 Even assuming arguendo the accuracy of the information contained in the stipulated log, it does not, standing alone, establish that Mr. Thibault maintained adequate books and records for Blue Water Charter during 1989 or any other year at issue or that he operated Blue Water Charter in a businesslike manner during those years. Nor is there anything else in the record that would allow us to make that finding. Petitioners also contend that Mr. Thibault's analysis of gross receipts for a charter boat fishing service that he prepared at the end of 1987 supports their contention that petitioner operated Blue Water Charter with an actual and honest profit objective. We disagree. Mr. Thibault did not prepare a cost analysis when he prepared the gross receipts analysis. [6] Without a cost analysis, Mr. Thibault could not have projected the profit potential of Blue Water Charter. *512 In arguing that Mr. Thibault operated Blue Water Charter during the years at issue with the objective of making a profit within the meaning of section 183, petitioners further point out that Mr. Thibault testified that he sought the advice of others in deciding to start Blue Water Charter. Petitioners presented the testimony of Mr. Rasmussen to corroborate that testimony. Although we find no reason to question the credibility of Mr. Rasmussen, his testimony does not establish that petitioner sought and relied on the advice of others knowledgeable in the charter boat fishing industry in deciding to start Blue Water Charter in 1988. Specifically, Mr. Rasmussen testified that he spoke with petitioner during the early 1980's, approximately six to eight years before petitioner began his charter operation, and that he discussed only general and basic questions relating to charter boat fishing and starting a charter boat fishing service. To support their contention regarding Mr. Thibault's profit objective, petitioners also contend that Mr. Thibault examined the costs of operating various charter fishing boats prior to buying Blue Diamond. In deciding to buy Blue Diamond, Mr. *513 Thibault testified that he looked at many vessels and that he chose Blue Diamond because "it's made for charter fishing and to cut the cost down it has diesel engines in it that operate a lot cheaper than gas." Mr. Thibault further testified that, in lieu of incurring an annual mooring fee of $ 2,000 for Blue Diamond, he purchased a $ 21,000 docking slip for Blue Diamond on May 17, 1988. Based on that testimony, petitioners apparently would have us believe that Mr. Thibault was cautious in starting Blue Water Charter, as demonstrated by his alleged attempts to keep operating costs of that charter service, including fuel charges and mooring fees, at a minimum. No evidence corroborates the self-serving testimony of Mr. Thibault. Petitioners have produced no profit and loss analysis supporting Mr. Thibault's decision to buy the docking slip. Nor have they explained Mr. Thibault's decision to sell Hooker 1, which he used for fishing, in order to purchase Blue Diamond. Although Hooker 1 was smaller than Blue Diamond, petitioner submitted to the DNR a registration and application form to use Hooker 1 to carry the same number of passengers for hire as *514 he subsequently requested for Blue Diamond. In contending that Mr. Thibault operated Blue Charter Water with a profit objective during each of the years at issue, petitioners make much of the fact that Mr. Thibault acquired certificates and licenses from the DNR that allowed him to operate Blue Diamond as a charter service. [7] This fact, standing alone, or considered in conjunction with the entire record herein, does not establish petitioners' position in these cases. Moreover, it appears that, despite Mr. Thibault's apparent compliance with the certification and licensing requirements of the DNR, he may not have complied with certain DNR reporting requirements during the years at issue. In a letter dated September 14, 1990, the DNR advised petitioner that it had not received from him required monthly catch reports for May, June, and July *515 1990. Mr. Thibault responded to that letter by explaining his failure to submit those required reports as follows: "This operation is not chartering fishing parties for the 1990 fishing season, but may be chartering in 1991." At trial, Mr. Thibault testified that, despite his representation to the DNR that Blue Water Charter was "not chartering fishing parties for the 1990 fishing season," Blue Water Charter in fact operated fishing charters during that season. The differences between Mr. Thibault's response to the DNR and his testimony cast further doubt on Mr. Thibault's credibility. To support their position in these cases, petitioners also allege that Mr. Thibault adequately advertised the services of Blue Water Charter. Petitioner testified that, when faced with a decline in the fisheries of the Great Lakes during mid-1988 or 1989, he responded by "putting out more fliers, they went out to further areas." Petitioners' joint Federal income tax returns for the years at issue do not reflect deductions for any advertising expenses for Blue Water Charter. Petitioners' failure to claim advertising expenses for Blue Water Charter for the years at issue belies Mr. Thibault's testimony *516 regarding his advertising efforts. Another contention advanced as support for petitioners' position relates to Mr. Thibault's testimony that, at the time he purchased Blue Diamond, dealers had represented to him that boats of the same size, make, and model year as Blue Diamond would appreciate in value. He also testified that the docking slip he purchased for $ 21,000 on May 17, 1988, had appreciated in value to $ 23,500 as of the date of the trial of these cases. No evidence corroborates petitioner's claims regarding appreciation in value of Blue Diamond or his docking slip. In fact, there is evidence in the record showing that Blue Diamond decreased substantially in value. Petitioners also contend that Mr. Thibault spent a lot of his time in operating Blue Water Charter, pointing to Mr. Thibault's testimony that (1) during the 1988 fishing season, Mr. Thibault devoted about two-thirds of his time to his charter service, and (2) during the 1989, 1990, and 1991 fishing seasons, he devoted practically all his time to that activity. In describing a typical work day on which he did not have a charter, Mr. Thibault testified that he would arrive at the mooring site *517 of Blue Diamond around 6:00 a.m. According to petitioner, he would wait there until 9:30 or 10:00 a.m., in the hope that a walk-on customer would charter his boat. Mr. Thibault testified that if he did not have a walk-on charter customer, he would eat breakfast and distribute advertising fliers and business cards at Oscoda area hotels, restaurants, stores, gas stations, and rest stops. He would then return to Blue Diamond around 3:00 p.m., where he would stay until 8:30 or 9:00 p.m., in the hope that a walk-on customer would charter Blue Diamond for that afternoon or evening. In describing a typical work day on which he had no charters, petitioner did not testify that he used, or even considered using, his free time to (1) complete monthly catch reports he was required to file with the DNR, (2) analyze, on an ongoing basis, the costs and revenues associated with Blue Water Charter, or (3) investigate and implement new methods of maximizing the revenue potential of Blue Water Charter or minimizing the costs associated with operating that charter service. It seems to us that if Mr. Thibault in fact had an actual and honest objective of making a profit from his charter *518 service, he would have spent his free time more productively in attempting to find ways to maximize the possibility that that service would become profitable. In deciding whether Mr. Thibault operated Blue Water Charter during the years at issue with the requisite profit objective, we note his success in operating T&S Demolition and Eastside Tree and in investing in real estate. Mr. Thibault's success in those endeavors leads us to conclude that he was a knowledgeable businessman. We find petitioner's decision to continue operating Blue Water Charter during the years at issue, despite the fact that that charter operation was generating substantial losses, to be inconsistent with his previous pattern of selling or ceasing businesses he operated when those businesses declined. It is also noteworthy that petitioners' income during the years at issue was substantial. Their total income as reported on line 23 of their 1989, 1990, and 1991 returns was $ 42,264, $ 49,794, and $ 63,034, respectively. Excluding losses petitioners reported from Blue Water Charter for 1989, 1990, and 1991, petitioners' total income as reported on line 23 of their 1989, 1990, and 1991 returns would have *519 been $ 67,238, $ 74,374, and $ 79,680, respectively. Petitioners' income during the years at issue, when coupled with the tax savings they received as a result of their claiming losses attributable to Mr. Thibault's operation of Blue Charter Water, permitted them to absorb the out-of-pocket costs associated with that operation without any apparent sacrifice in or change to their lifestyle. Petitioners have not shown that the losses generated by Blue Water Charter prevented them from living a comfortable life. See Golanty v. Commissioner, 72 T.C. at 428-429. We have considered, but on the instant record are not persuaded by, all of the other contentions of petitioners. Based on our consideration of all the facts and circumstances relating to Mr. Thibault's operation of a charter boat fishing service during each of the years at issue, we find that petitioners have failed to establish that Mr. Thibault operated that service during each such year with the objective of making a profit within the meaning of section 183. To reflect the foregoing, Decisions will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The gross receipts of Blue Water Charter were $ 5,780, $ 6,782, and $ 8,621 during the years 1989, 1990, and 1991, respectively.↩
3. Petitioners have not argued (1) that Mr. Thibault would have been required to make changes to the design of Blue Diamond↩ to accommodate such cruises or charters or (2) that the cost of making those changes, if any, would have proved to be uneconomical.
4. Petitioner testified that he maintained logs containing information similar to that found in the stipulated log for the years 1990 and 1991, but that he lost those logs prior to the trial of these cases. He also testified that, during the years at issue, he maintained an address book of customers of Blue Water Charter. However, no copy of that address book was proffered as evidence. We do not accept as accurate the self-serving testimony of Mr. Thibault as it relates to his maintenance of logs for 1990 and 1991 and an address book of customers of Blue Water Charter.↩
5. Mr. Thibault testified that he could not remember signing the October 1989 letter or to whom, if anyone, that letter was submitted. This is but one example of Mr. Thibault's hazy memory regarding matters that are unfavorable to petitioners' contention that, during each of the years at issue, petitioner operated Blue Water Charter with a profit objective.↩
6. The exhibit in the record reflecting Mr. Thibault's gross receipts analysis that he prepared at the end of 1987 contains a purported analysis of costs. That cost analysis appears to be based on expenses petitioners claimed in Schedule C of their 1989 return. Thus, although Mr. Thibault's testimony is inconsistent as to when that cost analysis was prepared, we find that it was not prepared at the end of 1987 when the gross receipts analysis was prepared. Instead, it appears to have been prepared sometime after 1989, perhaps during the audit of petitioners' 1989 return as petitioner testified.↩
7. Mr. Thibault also requested the DNR's authorization to use Hooker 1↩ as a charter service. Yet, he apparently never used that vessel in a charter fishing operation.